The document below is hereby signed.

Signed: October 07, 2010.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 09-00414 |
| STEPHEN THOMAS YELVERTON, | ) | (Chapter 7) |
| | ) | |
| Debtor. | ) | **Not for publication in** |
| | ) | **West's Bankruptcy Reporter** |

<u>MEMORANDUM DECISION RE DEBTOR'S MOTION FOR NEW JUDGMENT</u>

The debtor has filed a motion asking the court to reconsider its August 20, 2010, Order Denying Confirmation of Plan and August 20, 2010, Order Converting case to Chapter 7, and asking the court to enter new findings of facts and conclusions of law and new judgment on the debtor's behalf.  For the reasons that follow, I will deny the motion.

I

The relevant facts underlying this motion are as follows.  On May 14, 2009, the debtor, Stephen Thomas Yelverton, commenced the above-captioned case under chapter 11 of the Bankruptcy Code and thereafter filed a plan of reorganization, which he subsequently amended on July 14, 2010.  Yelverton proposed to

finance his plan through a combination of property recoveries and from his future earnings.  The plan proposed to make initial payments to classes 1-5 and 8 within 90 days of confirmation with payments continuing thereafter until these classes were paid in full.  Then, after classes 1-5 and 8 were paid in full, the plan proposed to commence payments to classes 6 and 7, paying class 6 in full and paying the entire principal and one-half the accrued interest and late fees in class 7.  Moreover, class 6, an administrative convenience class, would be paid a lump sum of up to $1,500 after payment of classes 1-5 and 8, and class 7 would be paid a $1,500 lump sum and then $500 per month for 5 years with a balloon payment of any amounts outstanding at the conclusion of the plan of any amounts remaining unpaid.  The plan also proposed to pay any ongoing alimony obligations to Yelverton's ex-wife, Alexandra Senyi de Nagy-Unyom, throughout the plan.  Finally, the plan provided that creditors in all classes, save Senyi, were only to receive payment after Yelverton paid Senyi her $17,000 per month support claim, deducted $7,000 per month for living expenses, paid any taxes due on his earned income or from the sales of property, and after Yelverton paid any "reasonable and necessary business expenses and costs of maintaining his law practice."

   On August 18, 2010, the court held a hearing on confirmation of Yelverton's amended plan and a hearing on the United States

Trustee's motion to convert the case to chapter 7. Prior to the hearing, Yelverton submitted ballots reflecting acceptance of the plan by classes 5, 6, and 7.[1] After hearing evidence on the matter, I denied confirmation on the basis of feasibility and based on a finding that Yelverton had failed to show he would be able to pay the administrative claims of Senyi and Sedghi on the effective date of the plan. After denying confirmation, I granted the Trustee's motion to convert pursuant to § 1112(b)(4)(a) of the Bankruptcy Code, finding that Senyi's post-petition alimony claim would result in a continuing loss to the estate and that, for the reasons stated above, there was no reasonable likelihood of reorganization. Additionally, I also granted the Trustee's motion to convert for general cause, finding Yelverton's plan so vague and ambiguous as to the rights of creditors as to be unconfirmable.[2]

On September 1, 2010, Yelverton filed a motion for new

---

[1] Sedghi Investment Properties was not listed in the plan, but cast a vote against the plan in the amount of $41,398.56. Yelverton conceded at the hearing that Sedghi should have been included in the plan.

[2] Particularly, I found troublesome that the plan provided that payments to creditors would be made only after payment of taxes on Yelverton's earnings and the sale proceeds, payments to Senyi, deductions of $7,000 per month in living expenses, and deductions for "any reasonable and necessary business expenses and costs for maintaining his law firm." These provisions coupled with Yelverton's failure to show a reasonable likelihood of generating income opened up the possibility that creditors would receive nothing.

judgment pursuant to Federal Rule of Bankruptcy Procedure 9023 asking the court to reconsider its orders denying confirmation and converting the case.

II

Under Federal Rule of Bankruptcy Procedure 9023, making Federal Rule of Civil Procedure 59 applicable in bankruptcy, a party may file a motion to alter or amend a judgment within 14 days of after entry of a judgment.  Moreover, "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." *Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004) (internal quotations and citations omitted).  To prevail on a motion to for new judgment, the moving party must establish "extraordinary circumstances." *Harrison v. Federal Bureau of Prisons*, 681 F. Supp. 2d 76, 84 (D.D.C. 2010) (quoting *Jung v. Assoc. of Am. Med. Colleges*, 226 F.R.D. 7, 8 (D.D.C. 2005)).  Importantly, a Rule 59 motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Company v. Baker*, 128 S. Ct. 2605, 2617 n.5 (2008) (internal quotations and citations omitted).

III

In his motion for new judgment, Yelverton sets forth several arguments for reconsidering the order denying confirmation of his plan and for reconsidering the order converting the case. I will address each in turn.

A

Yelverton first contends that the court should amend its decision denying confirmation because it erroneously concluded that he could not pay the domestic support obligation owed to Senyi at the time of confirmation. His argument in support of this basis for reconsideration is as follows.

Pursuant to his prenuptial agreement with Senyi, Yelverton and Senyi were to form Yelverton-Senyi International Partners, Ltd., for the purposes of carrying on "an international business and legal consulting firm." Yelverton was to fund a business account for the partnership in the amount of $500,000, over which Senyi was to have sole signatory authority and control. If Yelverton failed to fund the account, Senyi was to have a claim against Yelverton's assets in the amount of $500,000 plus interest. Although Yelverton concedes that these payments were to be considered marital support (Debtor's motion ¶ 3), Yelverton contends that because Judge Dalton's Findings of Facts and Conclusions of Law in Yelverton's divorce proceeding

5

"inexplicably and with no reasoned explanation" referred to the $500,000 as funding for a business account, that this prior payment would be subject to avoidance as a fraudulent conveyance under § 548(a)(1)(B) of the Bankruptcy Code.  With this money recovered, Yelverton concludes, he would have ample money to fund the initial payments required by the plan and decrease the amount required to be paid to Senyi as of the effective date for alimony.  This argument is unpersuasive.

First, as a preliminary matter, these are arguments and evidence that Yelverton could have presented at the confirmation hearing and, consequently, are not a proper basis for his motion. *See Exxon Shipping Company v. Baker*, 128 S. Ct. 2605, 2617 n.5 (2008).  Second, even were the court to consider this argument, it would still not provide a valid basis for relief.  Contrary to Yelverton's assertion, Judge Dalton's categorization of the $500,000 in payments as being paid for a business account are far from inexplicable–-the prenuptial agreement expressly states that "Alexandra shall have sole signatory authority and control over a **business account** to be funded by Stephen which shall be $500,000."  The mere fact that Judge Dalton used the term employed by Yelverton and Senyi in the prenuptial agreement does not amount to a determination that these funds were intended to be for anything other than domestic support.  Indeed, as Yelverton concedes, they in fact were intended by him "to be

6

marital support and were accepted as marital support." Judge Dalton's use of the term business account is dicta and, consequently, of no preclusive effect. Without these funds, Yelverton cannot pay Senyi's pre-petition support claim as of the effective date of the plan. Thus, confirmation is appropriately denied.

Along the same vein, Yelverton contends that the court erroneously converted the case when it failed to consider that the $500,000 he could now recover from Senyi as a result of Judge Dalton's characterization of funds as for a business account could be used to pay Senyi's support claim to date and would provide him with enough of a surplus to pay her post-divorce alimony of $17,000 month through May 2011. Thus, Yelverton continues, there would be no continuing diminution of the estate under § 1112(b)(4)(A) and conversion was inappropriate. This argument, too, is unpersuasive.

Again, these are arguments Yelverton could have raised at the hearing on the trustee's motion to convert and, therefore, are not a proper basis for reconsideration. Second, for the reasons stated above, Yelverton is not likely to recover the $500,000 because the money was intended to be for marital support, notwithstanding Yelverton's "characterization" argument. Third, even assuming that this argument were properly before the court and that Yelverton could avoid the $500,000 transfer to

Senyi as a fraudulent conveyance, his use of that money to pay Senyi would still result in a diminution of the estate. The $500,000 would be an asset of the estate that is being depleted by Yelverton's use of that money to meet his ongoing support obligation of $17,000 per month. If Yelverton did not pay the ongoing $17,000 per month obligation, then upon conversion to chapter 7, the alimony that has accrued postpetition would be a priority claim against the estate. 11 U.S.C. §§ 348(d) and 507(a)(1)(A).

An example is illustrative. Assume Yelverton owes Senyi $133,000 in pre-divorce spousal support.[3] Were the estate to recover the $500,000 from Senyi and liquidate today, it would be required to pay her the $133,000 as a priority claim. This would leave $367,000 for distribution to unsecured creditors. If, however, Yelverton were to continue on in Chapter 11 for, say, six more months, the unsecured creditors would only receive $265,000.[4]

Notwithstanding this, Yelverton responds "that short-term losses or a current cash shortfall are not a basis to convert to Chapter 7 because the debtor must be given a reasonable

---

[3] The amount Senyi claims in her proof of claim ($7,000 x 19 months). Yelverton's objection to Senyi's claim remains pending before this court.

[4] $500,000 minus $133,000 minus $102,000 in support from October 2010 to March 2011 ($17,000/month for 6 months).

opportunity to become profitable." Yelverton, however, has been in bankruptcy for more than 16 months and his operating reports only show an average monthly income of $2,686.03, in amounts that vary widely from month to month.[5] This is an amount insufficient even to pay Senyi's monthly spousal support claim, let alone Yelverton's living expenses and payments under the plan to unsecured creditors. Furthermore, Yelverton's unproven record in contingency fee plaintiff's litigation provides the court with little confidence in his ability to generate sufficient future income to fund a plan going forward. This coupled with the lack of funds being currently available to the estate and Senyi's continuing $17,000 per month claim, provide a strong impetus to convert now and preserve all available assets for the benefit of unsecured creditors.

B

Yelverton next contends that the court was in error to convert his case while liquidation was in process. In support of this argument, Yelverton relies on *In re Western Pacific Airlines, Inc.*, 218 B.R. 590 (Bankr. D. Colo. 1998). *Western Pacific* dealt with a chapter 11 reorganization where initially

---

[5] The monthly income disclosed in Yelverton's operating reports from June 2009 through September 2010 are, respectively, $143.76, $1,139.00, $3,949.90, $1,110.24, $1,944.85, $2,839.11, $2,234.34, $951.91, $10,500.92, $944.04, $4,141.00, $3,041.09, $2,350.58, $4,145.92, $2,490.19, and $1,049.59.

the debtor continued operations pursuant to a debtor in possession (DIP) financing arrangement. *Id.* at 592. In exchange for extending $30 million in financing, the DIP lender received an administrative super-priority, a first priority lien on unecumbered assets, and a senior security interest on proceeds from the disposition of the debtor's leaseholds in aircrafts. *Id.* After disbursing $23 million in funds, the DIP lender opted to curtail funding and, as a result, the debtor ceased operations and commenced liquidating its assets. *Id.* The creditors committee and the United States Trustee promptly filed a motion to dismiss or convert. *Id.* The *Western Pacific* court denied the motion, reasoning that it was more effective for the debtor to remain in chapter 11:

> [T]he Court is convinced that liquidation has and will proceed more expeditiously, more orderly and less expensively under the control of the Debtor, its existing management and senior staff, funded by its DIP lenders. If the case was converted, there would be (1) expenses associated with appointing a trustee and his/her attorneys; (2) disruptions resulting from delay and change in personnel; (3) time and resources needed, but not available, to train or familiarize replacement management/employees; and (4) turmoil in the enormous and complex record keeping and information disbursal tasks required by the business, by the DOT and FAA, by airline lessors and pilots (flight and maintenance records, etc.).

*Id.* at 595.

First, once again, this is an argument Yelverton should have raised at the hearing on the trustee's motion to convert. Second, even were the court to reach the merits of this argument,

Yelverton's case is readily distinguishable from *Western Pacific*. Although there will be additional expenses associated with appointing a trustee in this case, none of the other factors the *Western Pacific* court considered are present here: there will be no change in personnel, no need to train new management/employees, and no complex, agency-imposed record keeping requirements.  Third, if the mere fact that a trustee is to be appointed were a reason to deny conversion, no cases could be converted from chapter 11.  Fourth, only minimal steps would be required to liquidate this estate.  The only non-exempt assets Yelverton has to liquidate are a 4-acre lot in North Carolina, any ownership interest he may have in Yelverton Farms, and the equity interest in several entities, the valuation of which is based solely on speculative future income and unpaid income. This is hardly the case of a large airline.

Yelverton also argues that the court should not convert his case so as to allow him to continue his already-commenced avoidance actions against various defendants.  The fact that the case is being converted, however, does not mean that these actions will be abandoned.  Rather, the chapter 7 trustee will have the right to continue prosecuting these cases for the benefit of the estate, if he elects to do so.

C

Next, Yelverton contends that the court should reconsider its order converting the case because it was tainted by a conflict of interest on the part of White & Allen, counsel to Edmundson, et al., in the North Carolina litigation regarding Yelverton's ownership interest in Yelverton Farms. Particularly, Yelverton contends that the appearance of John Marshall of White & Allen at the August 18, 2010, hearing on Yelverton's Motion to Amend Order in Adversary Proceeding No. 10-10003 was inappropriate because White & Allen had previously represented Wade Atkinson in connection with securing a loan from Atkinson to Yelverton, which the ownership interest in Yelverton Farms was to serve as collateral.[6] Yelverton further argues that under North Carolina Professional Conduct Rule 1.9, White and Allen was required to obtain Atkinson's written consent prior to representing Edmundson, et al., in this proceeding. White and Allen's conflict, Yelverton continues, so tainted this proceeding as to require the court to vacate the orders denying confirmation and converting the case and to require the court to enter new findings of facts and conclusions of law. This argument is also unpersuasive.

First, White and Allen did not enter an appearance on either

---

[6] This court had previously determined in a related proceeding that security interest at issue was improperly perfected and, consequently, unsecured for bankruptcy purposes.

12

the motion to convert or the hearing on confirmation--its appearance was limited solely to the adversary proceeding. Second, the court did not rely on any representations regarding the North Carolina litigation in deciding to deny confirmation and covert the case.  Regarding the plan, the court denied confirmation because Yelverton had failed to demonstrate that he would be able to fund future payments under the plan with the income from his law practice, finding his contingency cases too speculative to show feasibility.  Moreover, the court denied confirmation because Yelverton had likewise failed to show that he would be able to make the payments required within 90 days of confirmation, including payments to Senyi of her past-due spousal support and Seghi's $40,000 administrative claim.  Although Yelverton testified that his ownership interest in Yelverton Farms and the past-due distributions owed to him by the company would be worth up to $400,000, Yelverton failed to demonstrate that he would have access to these funds in time to make payments to Sedghi and Senyi on the effective date.[7]  Regarding conversion, the court granted the trustee's motion based on

---

[7]  Yelverton testified that were the court to order a turnover of the stock he had "private lenders" who would be ready to advance funds, with the stock serving as collateral. Yelverton, however, did not identify these "private lenders," did not present any commitment letters, and otherwise failed to produce any competent evidence as to what amount these lenders would advance.  Yelverton's conclusory assertion that he could obtain loan funds from the stock was insufficient to meet his burden of showing feasibility.

continuing diminution of estate assets stemming from Senyi's $17,000 per month support claim--no representations by White and Allen in the adversary proceeding factored into this decision. Finally, Yelverton does not have standing to raise this potential conflict. Any argument as to conflict belongs to Atkinson, who both failed to appear at the confirmation hearing and has failed to file anything in this court raising the issue.

D

Yelverton's final basis for reconsideration is that the appointed Chapter 7 Trustee, William D. White, is conflicted out based on his firm's prior representation of creditors in a related adversary proceeding. White having withdrawn as trustee and a new trustee having been appointed, this argument is now moot and the court will deny it as a basis for reconsideration as such.

Conclusion

For the foregoing reasons, I will deny the Debtor's Motion for New Judgment. A separate order follows.

[Signed and dated above.]

Copies to: Debtor; Alexandra Nichole Senyi; Office of the United States Trustee.