FILED
JAN 16 2013
Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

Re: Stephen Thomas Yelverton    )
                                )
    Debtor                      )    Bankruptcy Case No. 09-00414
                                )
                                )    Chapter 7

## MOTION FOR LEAVE TO SUBMIT AFFIDAVIT AS TO THE PRODUCTION CONTRACT WITH MAXWELL FOODS, INC.

COMES NOW, Debtor Stephen Thomas Yelverton, and hereby requests leave to submit this Affidavit as to his Production Contract with Maxwell Foods, Inc., which affirms statements that he made at the Hearing as to the Exemptions, held on January 8, 2013, and provides additional pertinent information. The following is shown.

1. At the Hearing on January 8, 2013, Debtor Yelverton made statements in regard to his Production Contract with Maxwell Foods. The statements were not made under sworn testimony, and the purpose of this Affidavit is to affirm those statements, and to provide additional pertinent information.

2. This Affidavit affirms that Yelverton was awarded the Production Contract in December 1993 in his personal and individual capacity as the Grower. The policy of Maxwell Foods is to award such contracts only to individuals, and not to corporations. The purpose of this policy is to assure personal accountability and responsibility for performance on the Production Contract, which has specific personal obligations.

. 3. Yelverton was awarded the Production Contract after personal meetings in the summer of 1993 with executives of Maxwell Foods, at their corporate headquarters in Goldsboro, N.C. It is a primary supplier of pigs to Smithfield Foods, Inc., and is one of the major owners of that company.

1

4. In 1993, Maxwell Foods had some 100 independent Growers that housed and raised pigs owned by it to supply under contract to Smithfield Foods. Many of these Growers were elected or former members of the State Legislature and County Commissioners. At the time, Yelverton was a member of the law firm in Raleigh, which was headed by former Governor and U.S. Senator Terry Sanford (D-NC).

5. It was the responsibility of the Grower to obtain the politically contentious zoning and environmental permits from the state and county to construct the housing facilities for the pigs and the lagoons to handle waste for purification. The zoning and environmental permits would become grandfathered for any subsequent owners of the production facilities. After 1994, the state and county placed a moratorium on additional new production facilities, but allowing grandfathered facilities to expand.

6. In being awarded the Production Contract, Yelverton was assured by the executives of Maxwell Foods that it would be continuously renewed as long as there was faithful performance by him. Yelverton was told that their business plan was to buy-out all the independent Growers within 20 years at fair value of the business that the Grower had created. Yelverton was also told that there was an active market to sell Production Contracts and facilities to other Growers with Maxwell Foods, which it would approve, and that such sales were at fair value of the business based upon anticipated income.

7. Yelverton established Yelverton Farms, Ltd., in December 1993, to be his Agent to operate the business under his Production Contract. The production facilities were to be built on land that Yelverton's family had owned since 1759. He executed a 20-year Lease for this land so that with a buy-out by Maxwell Foods his family members could extend the Lease and collect rents, while retaining a reversionary interest in the land.

8. The Production Contract with Maxwell Foods is for a highly mechanized and minimal labor operation. The Grower builds housing for the pigs, which is self-contained with automated feeding and watering, where Maxwell Foods provides all feed and antibiotics at no cost to the Grower.

9. The flooring for the housing has slats where waste passes through underneath to be washed out to a lagoon by continuous automated flushing. Maxwell Foods provides at no cost to the Grower all fixtures for the housing and keeps them updated with state of the art technology.

10. Only two part-time persons are needed by the Grower to daily inspect the pigs and the mechanized operations. They are typically paid minimum wage.

11. Maxwell Foods is the owner of the pigs, which it breeds under genetically modified specifications for each of the discrete markets of Smithfield Foods. The pigs are provided at no cost to the Grower, who is responsible for their care while being fattened. After four months of growing to maturity, Maxwell Foods takes the pigs to Smithfield Foods for slaughter. The Grower is paid a set price for each live pig that Maxwell Foods sells under its contract with Smithfield Foods.

12. Maxwell Foods assumes all market risks under the Grower's Production Contract, and assumes all production costs, other than labor and electricity for the facilities. The yearly labor is about $40,000, and the electricity is about $10,000.

13. The necessary labor is for daily inspection of the pigs and the mechanized operations, cleanout and sanitizing of the houses every four months, and monthly spraying of waste from the lagoons on some 60 acres of Coastal Bermuda grass to grow hay. The selling of this hay to local horse and cattle raisers is income to the Grower.

14. The current normal operational costs to the Grower are estimated by Maxwell Foods to be about $50,000 per year. The current normal yearly payments by Maxwell Foods to the Grower are about $200,000 per year. Thus, the expected profits to the Grower would be about $150,000 per year.

15. At a capitalization rate of 10, this would value the business at $1.5 Million in a buy-out by Maxwell Foods, or by another Grower who is affiliated with it. The cost to the Grower to build the production facilities in the mid-1990's was about $700,000.

16. In 1997, Maxwell Foods changed some of the terms of its standard Production Contract to make it more generous to the Grower, and presented a new Contract to be signed by Yelverton as the Grower. At that time, Yelverton raised a concern that he had with payments being made to him personally as the Grower, which could be taxable to him, but where the business tax deductions were taken by Yelverton Farms, Ltd.

17. Yelverton spoke with George Pettis, who was an executive with Maxwell Foods. Mr. Pettis suggested that Yelverton note on the Production Contract that the payments by Maxwell Foods were to be directed to Yelverton Farms, Ltd.

18. Yelverton thereafter continued to be recognized as the Grower by Maxwell Foods and as the sole person responsible to assure performance on the Production Contract. It has only recognized Yelverton Farms, Ltd., as an Agent for Yelverton.

I, Stephen Thomas Yelverton, hereby affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*/s/ Stephen Thomas Yelverton*

Signed this 16th day of January.

WHEREFORE, in view of the foregoing, this Affidavit is submitted for consideration in resolution of the Exemptions claimed by Yelverton. This Affidavit demonstrates that he was awarded in 1993 in his individual and personal capacity the Production Contract with Maxwell Foods, Inc., and has always held it in that capacity, and has always been recognized by Maxwell Foods as the Grower to personally assume responsibility and accountability for performance on the Contract, where Maxwell Foods does <u>not</u> allow a corporation to be the Grower, but only individuals.

This the 16th day of January, 2013.

Respectfully submitted,

Stephen Thomas Yelverton, Pro Se,
D.C. Bar No. 264044
601 Pennsylvania Ave, N.W., Suite 900 South
Washington, D.C. 20004
Tel. 202-702-6708
Fax 202-403-3801
styelverton@yelvertonlaw.com

CERTIFICATE OF SERVICE

I, Stephen Thomas Yelverton, Esq., Pro Se, hereby certify that a copy of this Motion and Affidavit was served the 16th day of January, 2013, U.S Mail, first class, or by e-mail to:

Wendell W. Webster, Esq., Chapter 7 Trustee
Linda M. Correia, Esq.
Natalie S. Walker, Esq.
Webster, Frederickson
1775 K St., NW, Suite 600
Washington, DC 20006

Joseph A. Guzinski, Esq.
Office of U.S. Trustee
115 South Union St., Suite 210
Alexandria, VA 22314

Alexandra Senyi de Nagy-Unyom, Pro Se, Creditor
1260 21st St., N.W., Apt. 901
Washington, DC 20036

Richard J. Rodgers, Esq.
Cohn, Goldberg & Deutsch, LLC
600 Baltimore Ave., Suite 208
Towson, MD 21204
Counsel for Creditor Sedghi Investment Properties, LLP

Michael L. Murphey, Esq.
1320 Nineteenth St., N.W., Suite 202
Washington, DC 20036
Counsel for Creditor Melody H. Fennel

Wade H. Atkinson, Jr., Discharged Creditor
4530 Connecticut Ave., N.W., Apt. 404
Washington, D.C. 20008-4313

Stephen Thomas Yelverton, Esq.
D.C. Bar No. 264044