The document below is hereby signed.

Signed: April 16, 2013



_S. Martin Teel, Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| STEPHEN THOMAS YELVERTON, | ) | Case No. 09-00414 |
| | ) | (Chapter 7) |
| Debtor. | ) | Not for publication in |
| | ) | West's Bankruptcy Reporter. |

## MEMORANDUM DECISION AND ORDER RE OBJECTION TO AMENDED EXEMPTIONS

The debtor has filed further amended claims of exemption (Dkt. No. 594). The chapter 7 trustee filed objections (Dkt. No. 599) thereto.

On June 18, 2012, this court approved a global settlement negotiated by the chapter 7 trustee that provides for the transfer of the debtor's stock in the family business, Yelverton Farms, Ltd., to his siblings and the mutual release of all claims in consideration of a cash payment to the bankruptcy estate in the amount of $110,000.

### I. Exemption under 11 U.S.C. § 522(d)(5)

The debtor's further amended claims of exemption (Dkt. No. 594) no longer claim that any part of the proceeds of his shares

in Yelverton Farms, Ltd. is exempt under the "wildcard" exemption of 11 U.S.C. § 522(d)(5). Instead, Yelverton claims as exempt under § 522(d)(5) only the Production Contract with Maxwell Foods, Inc., in which Yelverton was named the "Grower" and which was the contract relating to the pig operation on the real property of Yelverton Farms, Ltd. Specifically, Amended Schedule C reads in this regard as follows:

| DESCRIPTION OF PROPERTY | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|
| Production Contract with Maxwell Foods, Inc., with Debtor as named party as Grower | 100% of FMV. $1 nominal value. Trustee represents contract to have no value. | $1 nominal value. $11,000 deduction. |

The trustee raises this objection to this § 522(d)(5) exemption claim:

> 3. This Court has previously ruled that the Debtor may exempt his aggregate interest in property, not to exceed $11,200, under the wild card exemption. See Memorandum Decision Re Cross Motions for Summary Judgment at Doc 587, Page 17 of 22. As explained by the Court, however, "an exemption under . . . [the wild card] does not exempt the asset itself. Instead, it exempts a capped dollar amount of the debtor's interest in that asset." Id. at Page 17 of 22.
>
> 4. Consequently, the Debtor may not exempt the Production Contract itself, but rather his interest in the contract, not to exceed a value of $11,200. To the extent that the Debtor seeks to exempt the contract itself, therefore, the Trustee objects to this exemption. In raising this objection, the Trustee notes that the contract provides that payments under the contract are to be paid to Yelverton Farms, as opposed to the Debtor. Production Contract at page 8 of 10, attached hereto as Exhibit 1. Consequently, the value of the Debtor's interest, if any, in the

>   production contract is not clear from the record in these proceedings.

Tr.'s Obj. (Dkt. No. 599). The trustee holds $110,000 in settlement proceeds, but those settlement proceeds are not proceeds of the Production Contract, which, to the extent it is an asset of the estate, remains an asset of the estate. Until the trustee disposes of the estate's interest in the Production Contract, the amount of the proceeds that can be attained from a liquidation of the Production Contract is uncertain.

The court, however, can readily resolve the debtor's § 522(d)(5) claim of exemption. The court rules that the debtor is entitled to recover $11,200 of the proceeds of the Production Contract to the extent that proceeds are ever realized. The estate's interest in the Production Contract will either be liquidated (with the debtor entitled to receive $11,200 of the sales proceeds) or will be abandoned to the debtor under 11 U.S.C. § 554 (in which event the Production Contract will cease to be property of the estate).

## II. Exemptions under § 522(d)(11)(E)

Under § 522(d)(11)(E), Yelverton claims two items to be exempt property, although the two items seem to be the same item described in different terms. First, he asserts that 100% of compensation for loss of future earnings from his 1333.3 shares of stock in Yelverton Farms, Ltd. is exempt (because it is

3

necessary to pay his support obligation to his former spouse, Alexandra Senyi). In that regard, the amended Schedule C states:

| DESCRIPTION OF PROPERTY | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|
| Compensation for loss of future earnings from stock in Yelverton Farms, Ltd. of 1333.3 shares. | 100% of future earnings for support of Alexandra Senyi of at least $17,000 per month in lump sum of at least $400,000. | At least $17,000 per month in lump-sum of at least $400,000. |

Second, and seeming to be redundant of the foregoing claim of exemption, Yelverton treats the settlement proceeds of his claim in the United States District Court for the Eastern District of North Carolina litigation ("the North Carolina litigation") for liquidation of his shares of stock in Yelverton Farms, Ltd. as distributions from his shares. He asserts that such distributions constitute earnings. Specifically, the amended Schedule C states:

| DESCRIPTION OF PROPERTY | VALUE OF CLAIMED EXEMPTION | CURRENT VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTION |
|---|---|---|
| Count 1 in Case No. 5:09-cv-331 before the U.S. District Court for E.D. of North Carolina for liquidation of 1333.3 shares of stock in Yelverton Farms, Ltd. pursuant to N.C. General Statutes 55-6-40(h), (i), (j), and (k). Yelverton Farms, Ltd., is a subchapter S corporation, and thus distributions may be treated as earnings. | 100% of claim which is valued at least $500,000.<br><br>Claims and valuations to be in accordance with Schwab v. Reilly, 130 S.Ct. 2652 (2010). | Valued at least $500,000. |

4

A

The trustee objects to these § 522(d)(11)(E) exemptions as follows:

> 5. . . . The Trustee objects to these exemptions on the grounds that the Debtor has failed to demonstrate a satisfactory basis for such exemptions. The Debtor has made no showing of loss earnings attributable to his labor with respect to his Yelverton farms stock or the litigation cause of action.

However, the trustee bears the burden of proving that the exemptions are not properly claimed. As this court previously stated:

> the trustee has the burden of showing that the amount of the settlement proceeds claimed as exempt as compensation for loss of future earnings is not properly exemptible. *See* Fed. R. Bankr. P. 4003(c); *see also In re Whitson*, 319 B.R. 614, 618 (Bankr. E.D. Ark. 2005) (finding that because the court had to speculate as to the proper portion of the settlement award attributable to loss of future earnings, the trustee had not met his burden of proof).

*Memorandum Decision re Cross Motions for Summary Judgment* at 20 n.7. *See also Carter v. Anderson (In re Carter)*, 182 F.3d 1027, 1029 n.3 (9th Cir. 1999); *In re Bova*, 205 B.R. 467, 478 (Bankr. E.D. Pa. 1997)("In light of these facts and the absence of any contrary evidence, noting that the burden of proof of the validity of objections to a claim of an exemption pursuant to § 522(d)(11)(E) is on the objector, . . . it is clear that the $20,000 remainder of the proceeds from the insurance settlement . . . can reasonably be attributed as a payment for loss of future

5

earnings under § 522(d)(11)(E)."). Therefore, the trustee has the burden of proving that the $110,000 in settlement proceeds is not a payment in compensation of loss of future earnings.

The trustee further suggests that Yelverton cannot claim settlement proceeds as exempt under § 522(d)(11)(E) because Yelverton did not perform services for Yelverton Farms, Ltd. postpetition:

> 6. The case law is clear that future earnings in 11 U.S.C. § 522(d)(1l)(E) encompasses earnings for "services performed" by an individual debtor after the commencement of the case. See *In re Jackson*, 593 F.3d 171, 178 (2d Cir. 2010). The Debtor has made no showing of any such work or services provided on behalf of Yelverton Farms. Consequently, the exemption of the Debtor's Yelverton Farms stock and litigation cause of action pursuant to 11 U.S.C. § 522(d)(11)(E) must be disallowed.

The trustee misreads *In re Jackson*. The court in *In re Jackson* determined that the term "loss of future earnings" refers to loss of postpetition future earnings, and that § 522(d)(11)(E) does not exempt compensation for loss of earnings attributable to a prepetition period. The debtor in *In re Jackson* did not perform services for his former employer postpetition, having been wrongfully terminated from employment, but he was still entitled to exempt that portion of the proceeds of his wrongful termination claim attributable to compensation for loss of earnings after the petition date. The suggestion that Yelverton

6

has to have performed services postpetition in order to qualify for the exemption in § 522(d)(11)(E) is erroneous.

Nevertheless, *In re Jackson* provides guidance regarding what can be exempted under § 522(d)(11)(E). That decision focused on the meaning of "future" in § 522(d)(11)(E). *In re Jackson*, 593 F.3d at 176-78. In interpreting that term, the court noted that under 11 U.S.C. § 541(a)(6), "'earnings from services performed by an individual debtor after the commencement of the case' are excluded from the estate." *Id.* at 176. The debtor's claim for wrongful termination was, of course, not a claim for compensation for services performed postpetition. Being in existence on the petition date, the claim became property of the estate under 11 U.S.C. § 541(a)(1). *Id.* "Notwithstanding section 541," section 522(b) allowed the debtor to "exempt from property of the estate . . . property that is specified under subsection (d)," which included property exemptible under § 522(d)(11)(E). *Id.* at 177. As the court noted:

> In sum, § 541 was designed to bring "anything of value that the debtors have into the estate," and § 522 was designed to "permit an individual debtor to take out of the estate that property that is necessary for a fresh start and for the support of himself and his dependents." H.R. Rep. No. 95-595, at 176 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6136.

It is readily apparent that the loss of earnings addressed in § 522(d)(11)(E) is a loss of the same types of earnings as are addressed in § 541(a)(6), namely, a loss of earnings for

7

"services performed."  To the extent reasonably necessary for the support of the debtor or a dependent, § 522(d)(11)(E) puts a debtor who has a claim for lost earnings for future services in the same position as a debtor who did not suffer a loss of the right or ability to perform future services, and whose compensation for such services would not have been estate property under § 541(a)(6) as "earnings from services performed by an individual debtor after the commencement of the case."

Although the term "earnings" generally is more expansive than "earnings from services performed," and includes earnings such as interest on a bond or dividends from shares of stock, the term "earnings" in § 522(d)(11)(E) is not that expansive.  For example, if a debtor has on the petition date a claim for lost future dividends arising from a theft of shares of stock, that type of lost earnings is not addressed by § 522(d)(11)(E).  Had the shares not been stolen, the shares would have become property of the estate on the petition date, and would not be excepted from the estate under § 541(a)(6).  Any future dividends from the shares would also be property of the estate.  Congress would not have intended to give a debtor a superior right regarding the future dividends based on the fortuity that the shares had been stolen, such that the estate had only a claim for the lost future dividends instead of the right as holder of the shares to receive the future dividends.  Accordingly, Yelverton is entitled to

8

exempt under § 522(d)(11)(E) only amounts that represent lost earnings for services, not amounts that represent the equivalent of dividends from shares (i.e., a return on capital invested).

Section 522(d)(11)(E) only applies to a *compensable* loss of future earnings for services for which compensation is recovered. It does not apply when the compensation's computation does not depend on the extent to which the ability to perform future services has been lost. Section 522(d)(11)(E) does not cover all lost future earnings, "but only payments which are being made to the debtor as compensation for the loss of future earnings." *See In re Bartholomew*, 214 B.R. 322, 325 (Bankr. S.D. Ohio 1997) (interpreting an Ohio statutory provision that is similar to § 522(d)(11)(E)).

The trustee and Yelverton have not addressed what amount of the settlement of Count 1 in the North Carolina litigation ought to be attributed to a *compensable* loss of any right of Yelverton to perform services for the corporation, versus a *compensable* loss of his rights in general as a shareholder. If Yelverton's siblings had a right to purchase his shares, and the purchase price was not required to take into account Yelverton's loss of a right to perform services for the corporation, any payment for the shares pursuant to that right would represent compensation for the shares, not compensation for loss of the right to perform future services. If, on the other hand, the required purchase

9

price depended in part on compensation to Yelverton for his loss of the right to earn income for services to be provided in the future by reason of his share holdings, part of the settlement of Count 1 would be attributable to compensation for a loss of future earnings.  *See In re Lewis*, 387 F. App'x 530, 533 (6th Cir. 2010) (the payment from Ford Motor Company to the debtor pursuant to a buyout option was compensation for loss of future earnings because the debtor "received a payment in exchange for waiving her right to all future earnings with Ford.").

   Yelverton asserts that Yelverton Farms, Ltd. is a subchapter S corporation and "thus the distributions to shareholders may be treated as earnings, where services are performed.  *In Re Carter*, 182 F.3d 1027, 1033, and n.8 (9th Cir. 1999)."  *Debtor's Response to Tr.'s Objs. to Amended Exemption* at 2.  He then explains that the exemption claim "capitalizes the earnings from the stock and determines a lump sum fair market value, which here is at least $500,000."

   The case cited by Yelverton, *Carter v. Anderson (In re Carter)*, 182 F.3d 1027 (9th Cir. 1999), dealt with a California statute that permitted exemption of earnings paid, and that defined "earnings" as "compensation payable by an employer to an employee for personal **services performed** by such employee[.]" *See In re Carter*, 182 F.3d at 1032 (quoting C<small>AL</small>. C<small>IV</small>. P<small>ROC</small>. C<small>ODE</small> § 706.011) (emphasis added).  The payment at issue was from the

10

debtor's subchapter S corporation. Instead of supporting Yelverton, however, *In re Carter* stands for the proposition that the fact that all of the income of a subchapter S corporation flows through to the shareholders for tax purposes does not determine whether the income is earnings for services for purposes of either tax law or bankruptcy law. *See In re Carter*, 182 F.3d at 1033 ("[O]n the record before us there is little indication that the payment was actually earnings within the meaning of § 706.011.").

That a company is a subchapter S corporation, with its income flowing through to shareholders, does not, without more, result in the liquidation price of the debtor's shares being compensation for a "loss of future earnings" within the meaning of § 522(d)(11)(E). Because "earnings" in § 522(d)(11)(E), and as in *In re Carter,* means income that is generated by an individual's services, compensation for lost future distributions from a subchapter S corporation would qualify as compensation for loss of future earnings under § 522(d)(11)(E) only to the extent that the compensation is based on the debtor's postpetition inability to perform services for the corporation.

Unless there is something more, a debtor's loss of income from a subchapter S corporation upon the liquidation of her shares is no different than a loss of dividends from shares of an officer of a publicly traded corporation whose shares (with other

11

shareholders' shares) are redeemed in a merger: without more, the redemption price is not compensation for the loss of earnings for possible future services, but compensation for the shares.

Distributions from a closely held corporation are earnings from services performed only to the extent that services are actually performed. In the case of § 522(d)(11)(E), this means that an exemption exists only to the extent there exists a right to compensation for a loss of the right to perform services. The trustee previously submitted tax returns of Yelverton Farms, Ltd., whose genuineness I do not recall Yelverton disputing. These returns do not suggest that the liquidation of Yelverton's shares would include compensation for a loss of future earnings for services. For example, the 2009 return shows that officers were paid $21,600 in compensation and that after taking that and other expenses into account, the corporation had ordinary business income of $30,869, net rental income of $2,985, and interest of $51, of which items Yelverton's share was 24.997%, or, respectively, $7,716, $746, and $13. Such shares of corporate income are not earnings from services rendered, and Yelverton has not contended that he was one of the officers receiving the $21,600 in officer compensation, or that he would be an officer receiving compensation in the future.

Even if, in the abstract, a debtor has a right upon liquidation of his shares in a closely held corporation to

12

compensation for a demonstrable loss of earnings for performing future services for the corporation, the record so far does not show that Yelverton lost any right to perform services for the corporation in the future.  The record so far does not suggest that he was performing services for the corporation by reason of his shareholder status.  If that is the case, Yelverton has not suggested how he lost any future earnings for performing services for the corporation.

Nor has Yelverton contended that if he *was* receiving (or would be in the future receiving) compensation for services, the liquidation of his shares required that, instead of being compensated for just the general value of the shares, he was to be compensated additionally for services income lost by reason of no longer being employed by the company after the shares were liquidated.  Consider a trustee's sale of a debtor's interest in a solely owned corporation.  In contrast to a scheme like the employment buy-out in *In re Lewis*, it is the assets of the corporation that are being sold, and the debtor has no right to be compensated for the earnings she would have made if she had continued working through the vehicle of the corporation.  If § 522(d)(11)(E) applies to every sale of a closely held corporation, that would require an exploration of what part of the sales price of the debtor's shares is attributable to the assets of the corporation versus the potential, through those

13

assets, for the debtor to have continued to engage in performing services to the corporation. That seems far afield from what Congress likely intended. It goes too far to say that in buying the shares, the purchaser is compensating the estate for the debtor's loss of potential future compensation for services to the corporation. The issue, however, is what North Carolina law required in fixing a liquidation price for shares, and neither party has addressed whether that includes compensating the shareholder for any loss of earnings he would have received upon providing future services to the corporation.

The trustee, as previously noted, bears the burden of proof, and thus is the party required to show that no part of the settlement of Count 1 can be attributed to compensation for the loss of earnings for potential future services. The court cannot rule on the objection until evidence is presented.

B

The foregoing analysis in part A seems likely academic. Yelverton seeks to exempt settlement proceeds from the settlement of the North Carolina litigation, but this court's examination of the docket in that case shows that Yelverton's claims did not seek compensation for loss of future earnings. In the North Carolina litigation, Yelverton sought relief for alleged oppressive conduct by the controlling shareholders of Yelverton Farms, Ltd. Yelverton alleged that his reasonable expectations

14

as a minority shareholder in Yelverton Farms had been frustrated by the majority shareholders' actions.  Yelverton did not assert a claim for wrongful termination as an officer of Yelverton Farms, Ltd., nor did he seek damages for any loss of compensation he may have been entitled to as an officer of the corporation.  Rather, his claims in the North Carolina litigation were asserted from his position as a shareholder: he sought dividends or profits allegedly owed to him by the corporation, a mandatory buyout of his shares or liquidation of the corporation because he was allegedly squeezed out of management, damages for alleged malicious interference with a contract to sell Yelverton's shares, damages for alleged malicious interference with the sale of real estate by Yelverton, and the payment of land rents to Yelverton.  None of these claims sought compensation for loss of future earnings.  Yelverton, however, is entitled to attempt to demonstrate to the contrary.

C

In addition, Yelverton suggests that it is not the shares in Yelverton Farms, Ltd. that give rise to a § 522(d)(11)(E) claim of exemption, but instead, the Production Contract (which he asserts that Phyllis Edmundson and Deborah Marm–defendants in the Eastern District of North Carolina litigation–tortiously interfered with after the commencement of this case):

15

> 9. In his Objection, at para. 6, the Trustee claims that Yelverton has performed no services for Yelverton Farms, Ltd., and thus may not utilize 11 U.S.C. 522 (d)(11)(E).
> 10. However, the Trustee *ignores* that Yelverton has always been the sole holder of the Production Contract with Maxwell Foods, Inc., which under its terms specifically requires him to personally manage this contract, and which provides all income to Yelverton Farms, Ltd. See, Production Contract, paras. 1, 5-7, 9 and 11, pp. 1-4.
> . . .
> 13. [A]ny inability of Yelverton to perform post-Petition his management services under the Production Contract on behalf of Yelverton Farms, Ltd., is because of "tortuous interference" [sic] by Edmundson/Marm, and thereby is not a proper basis to deny him the claimed Exemption under 11 U.S.C. 522 (d)(ll)(E) for post-Petition future earnings from contract management services on behalf of the corporation.

*Debtor's Response to Trustee's Objections to Amended Exemption* at 3. It appears that Yelverton is arguing that a portion of the settlement proceeds is an award for postpetition loss of earnings under the Production Contract. He claims that he should be compensated for postpetition services that he was prevented from performing because of the alleged tortious interference by Edmundson and Marm with the Production Contract.

It is important to keep in mind what Yelverton has claimed as exempt: settlement proceeds from the settlement of Count 1 of the North Carolina litigation and for his rights as a

16

shareholder.[1]  He claims that the settlement proceeds include payment for liquidation of his stock and this payment amounts to compensation for loss of future earnings.  He has not claimed as exempt any claims in the North Carolina litigation for tortious interference with the Production Contract.  Nor could he, because no such claim had been asserted at the time the settlement was approved.  Yelverton did not mention the Production Contract in his complaint or amended complaint in the North Carolina litigation.  Yelverton only relied on the Production Contract in his motion for summary judgment in that case.  In that motion, he refers to the Production Contract as support for his claim for dissolution of the corporation on the basis that he had a "'substantial reasonable expectation' that he would have a role in the management of Yelverton Farms, Ltd., as an officer, in fulfillment of the contract," which the defendants had frustrated.  Mtn. for Summary Jdgt., Dkt. No. 40, Case No. 5:09-CV-331-FL (E.D.N.C.).  That does not amount to a claim for compensation for loss of future earnings.

　　　As a result, Yelverton had no claim in the North Carolina litigation for damages under the Production Contract.  Therefore, the settlement proceeds from that litigation cannot be

---

[1]  By "Count 1," this court assumes Yelverton means paragraph 1 of his prayer for relief in his complaint in the North Carolina litigation, because the complaint does not include the words "Count 1."

attributable to compensation for loss of future earnings under the Production Contract because the litigation did not involve a claim under the Production Contract.

### III.  Conclusion

For these reasons, it is

ORDERED that the trustee's objection (Dkt. No. 599) is OVERRULED in part and Yelverton is allowed an exemption under 11 U.S.C. § 522(d)(5) of up to $11,200 from the proceeds of the Production Contract to the extent that proceeds from the Production Contract are ever realized.  It is further

ORDERED that a scheduling conference relating to the trustee's remaining objections to the debtor's amended Schedule C is set for **May 1, 2013 at 9:30 A.M.**

[Signed and dated above.]

Copies to: Debtor; Recipients of e-notification of orders.