The document below is hereby signed.

Signed: December 5, 2013



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
STEPHEN THOMAS YELVERTON,      )       Case No. 09-00414
                               )       (Chapter 7)
              Debtor.          )       Not for publication in
                               )       West's Bankruptcy Reporter.

<u>MEMORANDUM DECISION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

The debtor seeks to exempt, under § 522(d)(11)(E) of the

Bankruptcy Code (11 U.S.C.), a portion of the proceeds from the

trustee's settlement of various litigation claims.  The trustee

objects to this claim of exemption.  Both the trustee and the

debtor, Stephen Yelverton, have filed motions for summary

judgment on the trustee's objection to Yelverton's claim of

exemptions.[1]

_____

[1] Yelverton filed an opposition to the trustee's motion.
(Dkt. No. 751).  In addition, Yelverton filed a *Reply to the
Non-Response of the Trustee to the Debtor's Motion for Summary
Judgment as to Trustee's Objections to Exemptions* (Dkt. No.
763).  The trustee has not filed an opposition to Yelverton's
motion for summary judgment.

## I.   Background

On May 14, 2009, Yelverton filed this case under chapter 11 of the Bankruptcy Code.  The case was subsequently converted to chapter 7 and a chapter 7 trustee was appointed.  *See Affidavit of Wendell W. Webster* ("Tr. Aff.") (Dkt. No. 732-1) at ¶ 6.  At the time of filing, one of Yelverton's principal assets consisted of 1,333.3 shares of stock in a family-owned hog topping business named Yelverton Farms, Ltd. ("Yelverton Farms").  *See Schedule B* (Dkt. No. 22).  These shares gave him approximately a one-fourth ownership interest in the corporation.  *See Trustee's Motion for Summary Judgment* ("Tr. Mtn.") (Dkt. No. 732), Ex. 2 at p. 8.  The primary source of income for Yelverton Farms is a production contract with Maxwell Foods, Inc. (the "Production Contract").  *See Debtor's Motion for Summary Judgment* ("Debtor's Mtn.") at ¶ 4.  The parties to the Production Contract are Yelverton, as the "Grower," and Maxwell Foods, Inc.  *See* Tr. Mtn., Ex. 6 at 1.  Nevertheless, payments under the Production Contract are to be made to Yelverton Farms, not Yelverton.  *See id.* at 7-8 (handwritten note).

After filing this case, Yelverton brought suit in the U.S. District Court for the Eastern District of North Carolina, Case No. 5:09-cv-331-FL (the "North Carolina litigation"), against Yelverton Farms and the three other shareholders.  *Trustee's*

*Statement of Material Facts Not in Dispute* ("Tr. St.") (Dkt. No.
732) at ¶ 3 & Tr. Mtn., Ex. 1; Debtor's Mtn. at ¶ 6.  Yelverton
asserted the following causes of action against the defendants:
(1) that they be compelled to pay him dividends and profits, or
redeem his shares at fair value; (2) that Yelverton Farms be
placed in receivership and liquidated, or for a mandatory buy-
out of Yelverton's shares; and (3) that Yelverton Farms be
ordered to pay land rent that it allegedly owed to Yelverton.
*See Complaint* & *Amended Complaint*, Tr. Mtn., Ex. 1.
Significantly, Yelverton did not assert a claim against
Yelverton Farms for breach of any employment agreement.
Yelverton also asserted claims against his sister, Phyllis
Edmundson, for breach of contract, malicious interference with
contractual relationships, malicious interference with public
auction of real estate, and acting in restraint of trade or
commerce.  *Id.*

After conversion of this case to chapter 7, the trustee was
substituted as the plaintiff in the North Carolina litigation.
*See* Tr. St. ¶ 8; Tr. Aff. ¶¶ 9-10.  The trustee negotiated a
settlement and release of all claims asserted by or against the
debtor and the defendants with respect to the debtor's ownership
interest in Yelverton Farms.  *See* Tr. Aff. ¶ 21.  The settlement
provides for the transfer of the debtor's stock to his siblings
and the mutual release of all claims in consideration of a cash

3

payment to the bankruptcy estate in the amount of $110,000. *See* Tr. Mtn., Ex. 4. On June 19, 2012, following a lengthy hearing, the court approved the settlement. *See* Dkt. No. 477. On February 4, 2013, the debtor filed amended exemptions claiming as exempt under § 522(d)(11)(E) Count One in the North Carolina litigation for the redemption of his 1,333.3 shares of stock in Yelverton Farms. *See Amended Schedule C* (Dkt. No. 594).[2]

The trustee's objection concerns only Yelverton's claim of exemption under 11 U.S.C. § 522(d)(11)(E). On Schedule C, Yelverton lists this exemption as follows:

> Compensation for loss of future earnings from stock in Yelverton Farms, Ltd. of 1,333.3 shares.
>
> Count 1 in Case No. 5:09-cv-331 before the U.S. District Court for E.D. of North Carolina for liquidation of 1,333.3 shares of stock in Yelverton Farms, Ltd. pursuant to N.C. General Statutes 55-6-50(h), (i), (j), and (k). Yelverton Farms, Ltd. is a Subchapter S corporation, and thus distributions may be treated as earnings.

---

[2] Claims of exemption must be asserted on a form called Schedule C. Yelverton has amended his Schedule C numerous times. In the first Schedule C he filed, he did not exempt his stock in Yelverton Farms. *See* Dkt No. 22. He subsequently amended his Schedule C at least six times. *See* Dkt. Nos. 487, 491, 494, 519, 594 and 662.

This court previously disallowed Yelverton's claims of exemption (*see* Dkt No. 519) that he based on tenancy by the entireties law. *See Memorandum Decision re Cross Motions for Summary Judgment* (Dkt. No. 587). What is now before the court is the trustee's objection to Yelverton's claimed exemption under § 522(d)(11)(E) asserted in his exemption claims filed February 4, 2013 (Dkt. No. 594). The later-filed amended Schedule C (Dkt. No. 662) added another exemption and did not alter the § 522(d)(11)(E) exemption asserted in the amended Schedule C filed on February 4, 2013 (Dkt. No. 594).

Dkt. No. 594.  As the trustee's affidavit notes:

> The settlement of the North Carolina Litigation was a
> complete settlement of all claims asserted by the
> parties in the litigation.  The Debtor did not assert
> any claim for lost earnings for services performed on
> behalf of Yelverton Farms in the North Carolina
> Litigation and no claim for the Debtor's right to
> perform services for the corporation was included in
> the North Carolina litigation.

Tr. Aff. ¶ 24.

## II.   Legal Standards

### A. Summary Judgment

Summary judgment is granted when there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(a)

(incorporated by Fed. R. Bankr. P. 7056); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d

265 (1986).  "A dispute over a material fact is 'genuine' if

'the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  *Arrington v. United States*,

473 F.3d 329, 333 (D.C. Cir. 2006) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d

202 (1986)).  A fact is "material" if it might affect the

outcome of the suit under the substantive governing law.  *Id.*

In evaluating a motion for summary judgment, the court must view

the evidence in the light most favorable to the nonmoving party.
*Id.*

### B. Objections to Exemptions

The commencement of a bankruptcy case creates a bankruptcy
estate.  *See* 11 U.S.C. § 541(a).  The bankruptcy estate includes
"all legal or equitable interests of the debtor in property as
of the commencement of the case." *Id.* § 541(a)(1).  To
facilitate a fresh start and to support himself and his
dependents, a debtor is permitted to exempt certain property
from the bankruptcy estate.  *See Jackson v. Novak (In re
Jackson)*, 593 F.3d 171, 177 (2d Cir. 2010) (citing H.R. Rep. No.
95-595, at 176 (1977)).  A debtor's claimed exemption is
presumptively valid and the party objecting to the exemption has
the burden of proving that the claimed exemption is not proper.
Fed. R. Bankr. P. 4003(c); *see also In re Burkette*, 279 B.R.
388, 391 (Bankr. D.D.C. 2002); *In re Scotti*, 245 B.R. 17, 21
(Bankr. D.N.J. 2000).  A trustee who objects to a
§ 522(d)(11)(E) exemption of settlement proceeds fails to meet
this burden if the court has to speculate as to how the
settlement proceeds were allocated.  *See In re Whitson*, 319 B.R.
614, 618 (Bankr. E.D. Ark. 2005) (finding that trustee had not
met his burden of proof because the court had to speculate as to

6

the amount of settlement proceeds in a personal injury suit

attributable to compensation for loss of future earnings).[3]

The exemption provision at issue in this case provides that

a debtor may exempt:

> The debtor's right to receive, or property that is
> traceable to . . . a payment in compensation of loss
> of future earnings of the debtor or an individual of
> whom the debtor is or was a dependent, to the extent
> reasonably necessary for the support of the debtor and
> any dependent of the debtor.

11 U.S.C. § 522(d)(11)(E). The court explained in its previous

decision addressing Yelverton's claimed exemptions that the term

"earnings" in section 522(d)(11)(E) is not so expansive as to

encompass future dividends from shares. *See Memorandum Decision*

*and Order Re Amended Exemptions* (Dkt. No. 633, Apr. 16, 2013) at

7-9. Rather, the term refers to the same type of earnings that

are addressed in 11 U.S.C. § 541(a)(6), namely, earnings for

---

[3] There is no explanation in the Advisory Committee Notes
to Rule 4003(c) for why the burden of proof is placed on the
trustee in a case (even if outside of bankruptcy the debtor
would bear the burden of proof in asserting an exemption under
nonbankruptcy law). By placing the burden on the trustee in
this case, Rule 4003(c) places the burden on the trustee to
prove a negative, namely, that none of the proceeds are
attributable to the fanciful claims that Yelverton has belatedly
asserted in an effort to contend that he had a right to
compensation for loss of future earnings. With all due respect
to the rulemakers, this case illustrates why the burden of proof
ought not be cast on the trustee when there is an objection to
exemptions.

"services performed."[4]  *Id.* at 7-8.  The court explained that

"Yelverton is entitled to exempt under § 522(d)(11)(E) only

amounts that represent lost earnings for services, not amounts

that represent the equivalent of dividends from shares (i.e., a

return on capital invested)."  *Id.* at 8-9.  Specifically,

section 522(d)(11)(E) "does not apply when the compensation's

computation does not depend on the extent to which the ability

to perform future services has been lost."  *Id.* at 9.

### III. Analysis

#### A. The trustee's and Yelverton's arguments

The trustee argues that because none of Yelverton's claims

in the North Carolina litigation sought compensation for loss of

future earnings, the settlement of those claims necessarily does

not include any amount attributable to compensation for loss of

future earnings.  In addition, the trustee, who negotiated the

settlement, avers that:

> No part of the proceeds from the settlement of the
> North Carolina Litigation was calculated based on any
> claim for the Debtor's right to perform services on
> behalf of Yelverton Farms and no part of the
> settlement proceeds is attributable to a compensable
> loss of any right of the Debtor to perform services
> for the corporation.

Tr. Aff. ¶ 25.

---

[4]  Section 541 sets forth the property that comprises the
bankruptcy estate.  Section 541(a)(6) states that the property
of the estate does not include "earnings from services performed
by an individual debtor after the commencement of the case."

However, Yelverton asserts that his stock dividends are
earnings for services performed and, as a result, that the
amount of settlement proceeds attributable to the value of his
stock includes compensation for this loss of future earnings.
To support this argument, Yelverton states that under the
Production Contract he was "required to personally provide
management services."  Debtor's Mtn. at ¶ 4.  He claims that his
stock distributions were earnings attributable to those
services.  In particular, he states:

> At the inception of the corporation 1994 [sic], it was
> agreed that I would be paid by Sub-Chapter S earnings
> distributions from the corporation as a stockholder
> for the services that I performed as an Officer,
> Director, and manager of the Production Contract.

*Debtor's Opposition to Trustee's Motion* ("Debtor's Opp.") (Dkt.
No. 751), Ex. 2 (*Debtor's Discovery Responses*) at p. 4, ¶ 8.  He
also explains that the "'earnings' for his personal services
were distributed to him as a stockholder."  Debtor's Opp. ¶ 10.

## B. Yelverton did not assert a claim for loss of future earnings in the North Carolina litigation

Plainly the claims in the North Carolina litigation did not
seek compensation for loss of future earnings.  Moreover, the
trustee's averment shows that the parties negotiating the
settlement did not treat any portion of the settlement proceeds
as being based on a claim for compensation for loss of future
earnings.  Therefore, the trustee has met his burden of showing

that the negotiated settlement did not include an amount
attributable to any claim for compensation of loss of future
earnings.

### C. North Carolina law entitled Yelverton to recover the fair value of his shares, not compensation for loss of employment with the corporation

The settlement of Yelverton's claims for redemption,
liquidation or mandatory buyout was not required to take into
account any loss of future earnings on Yelverton's part.  None
of the North Carolina statutes invoked by Yelverton in the North
Carolina litigation requires that the purchase price for the
shares take into account the shareholder's loss of a right to
perform services for the corporation.  *See* N.C. Gen. Stat.
§§ 55-6-40(h), (i), (j), (k) (providing for shareholder actions
against corporations and directors to compel the payment of
dividends).  In particular, section 55-6-40(j) of the North
Carolina General Statutes provides that upon receiving a demand
for the payment of dividends, a corporation may elect to redeem
the shares of the shareholder making the demand and shall pay to
such shareholder the "fair value of his shares."  N.C. Gen. Stat.
§ 55-6-40(j).  In addition, section 55-14-31(d) provides that a
corporation may avoid dissolution by purchasing the complaining
minority shareholder's shares "at their fair value, as
determined in accordance with such procedures as the court may
provide."  N.C. Gen. Stat. § 55-14-31(d); *see also Complaint,* Tr.

Mtn., Ex. 1.  Accordingly, these provisions speak of "fair value," but do not define the term and do not require any compensation to the shareholder for loss of income based upon the shareholder no longer providing services to the corporation.

Moreover, the North Carolina case law interpreting "fair value" does not require that compensation for loss of future earnings be taken into account.  In determining "fair value" under section 55-14-31(d), North Carolina courts have looked to the following factors: market value, discounts for lack of control and marketability, objections to valuation raised by the parties, changes in condition, equitable considerations, and practical considerations.  *See Royals v. Piedmont Elec. Repair Co.*, No. 97 CVS 720, 1999 WL 33545516, at *12-14 (N.C. Mar. 3, 1999), *aff'd*, 529 S.E.2d 515 (N.C. Ct. App. 2000).

The statutory scheme compensates the shareholder for the fair value of his shares, and that fair value takes into account rights accruing to the shareholder *by virtue of those shares*. As a result, the cessation of the shareholder's employment with the corporation is not a factor taken into account in arriving at a fair value if the shareholder did not hold that employment by virtue of being a shareholder.  In effect, when the shareholder *does* enjoy a right of employment as a shareholder, the termination of the shareholder's interest amounts to effecting a termination of an employment agreement.

11

Additionally, even when the minority shareholder has the right
to employment by the corporation based on such a shareholders'
agreement, the minority shareholder's loss of employment is not
taken into account in determining the fair value of his shares
if the shareholder can obtain employment elsewhere that promises
to pay him as much.

This is illustrated by *Garlock v. Southeastern Gas & Power,
Inc.*, 2001 WL 34054523 (N.C. Super. Nov. 14, 2001), a decision
that shows why the assertion of Yelverton's shareholder rights
did not include any compensation for loss of future earnings for
services performed.  In *Garlock*, at the time of the formation of
Southeastern Gas & Power, Inc., the majority shareholder
(Hilliard) had been sentenced to imprisonment for income tax
fraud, and even though Hilliard was furnishing to the
corporation his customer base, he needed the minority
shareholders to operate the business while he was incarcerated.
Accordingly, "when the business was formed, there was a mutual
dependence between plaintiffs [the minority shareholders] and
Hilliard."  *Garlock*, 2001 WL 34054523, at *3. In negotiating the
terms incident to the formation of the corporation, this gave
the minority shareholders leverage they would not otherwise have
had as against Hilliard:

> Not only would [the formation of the corporation]
> provide him guaranteed employment the day he got out
> of prison, it would provide him substantial income

12

> while he was incarcerated.   The *original deal agreed
> to* by all the parties was beneficial to everyone, and
> each provided consideration for his or her part.   The
> four participants had not only an "expectation" but
> also *an agreement* with respect to their employment,
> their duties, and the share of the profits and
> expenses.

*Id.* (emphasis added).   In other words:

> These shareholders, both majority and minority, had an
> *express agreement* from which each derived some
> benefit.   Hilliard exchanged some control he would
> normally have had as the largest shareholder for the
> benefits he received from the plaintiffs' efforts
> while he was in prison.

*Id.* at *12 (emphasis added).   One part of that agreement was a
"revenue sharing arrangement" that allowed the minority
shareholders' compensation "to exceed by significant margins the
amount normally paid to employees in their positions in
comparable companies."   *Id.* at *6.   Indeed, the company "was run
more like a partnership because of the original agreement
concerning allocation of income, expenses, and duties."   *Id.*
"Hilliard's sales abilities were key to the continued growth [of
the company], but he had given up most of his leverage in *the
original agreement* to insure his continued income while in
prison and the guarantee of a well paying job when he was
released."   *Id.* (emphasis added).   Based on that agreement,
reasonable expectations of the minority shareholders included
continued employment by the corporation and "sharing of the

earnings of the corporation substantially in the fashion of the *original earnings distribution pro forma*." *Id.* at 10-11 (emphasis added).[5]  In fixing a "fair value" for the shares, the court noted:

> Plaintiffs have lost employment which can be replaced. They earned more with Southeastern then they would've earned on the open market because of the *revenue sharing arrangement*. They have been deprived that additional income since their employment ended and it will be lost to them in the future.

*Id.* at *16 (emphasis added).

Therefore, in fixing the fair value for the minority shareholders' shares, the *Garlock* court took into account the minority shareholders' loss of "additional income" by virtue of the "revenue sharing arrangement" (the "original earnings distribution pro forma").  Accordingly, *Garlock* indicates that loss of "additional income" can be an appropriate factor to consider in fixing the fair value of shares.  However, it is important to keep in mind three important facts in the case. First, the minority shareholders in *Garlock* were employed by Southeastern Gas & Power, Inc., by virtue of being shareholders in the corporation.  Second, the court highlighted the fact that the minority shareholders would not be able to find replacement

---

[5]  *See also id.* at *16, noting that Hilliard "chose to use his majority power to defeat legitimate expectations *which he had previously agreed to* when it was in his interest to do so." (Emphasis added.)

employment that paid them as much as Southeastern Gas & Power, Inc., because at that corporation they were compensated according to the revenue sharing arrangement.  Finally, the court found a loss of "additional income" by virtue of the "revenue sharing arrangement" (the "original earnings distribution pro forma"), and such an arrangement is arguably more in the nature of a distribution of earnings of the corporation, not compensation for services rendered.

It did not matter in *Garlock* whether the payments under the revenue sharing agreement were salary or dividends because either way the payments, arising from the shareholders' agreement *in forming the corporation*, were a factor to take into account in fixing the fair value of the shares.  Accordingly, *Garlock* does not answer the question of what would have happened if one of the minority shareholders in *Garlock* had then filed a bankruptcy case and claimed the "fair value" award to be exempt under section 522(d)(11)(E).  In that instance, the bankruptcy court would have had to analyze whether this loss of additional income that the North Carolina court took into account in arriving at a "fair value" was "loss of future earnings" within the meaning of section 522(d)(11)(E).  That would require determining whether the loss of payments under the revenue sharing arrangement was a loss of distributed earnings (in other words, dividends) or was instead a loss of salary payments

15

(whether genuine salary payments or disguised dividends dressed up as salary payments), an issue that *Garlock* did not address.

If the loss of additional income that the *Garlock* court considered was on account of the minority shareholders' loss of dividends from the corporation, then the fair value of their shares would not include any amount exemptible as payment in compensation of loss of future earnings.  This is because dividends are not earnings for services performed, and, consequently, not within the purview of section 522(d)(11)(E). If, however, the loss of additional income was on account of the minority shareholders' earning a lower salary at another job than the salary they had earned at Southeastern Gas & Power, Inc., then it would be possible that a portion of the fair value for their shares was payment for compensation of loss of future earnings.  The bankruptcy court would have to determine whether Southeastern Gas & Power Inc.'s payments to the minority shareholders were actually salary payments or were disguised dividends (which might very well be the case if a reasonable compensation for the shareholders' services did not exceed what they could earn elsewhere).

Nevertheless, the North Carolina statute at issue is concerned with arriving at a "fair value" for the shares, and the statute does not purport to be a statute for fixing compensation for loss of employment.  It is only indirectly that

the fixing of "fair value" takes into account the loss of
employment that was guaranteed to a minority shareholder by
virtue of her shareholder status.  I need not decide whether
such incidental consideration of loss of employment in
determining fair value could result in a right to receive a
payment for the shares that qualifies as "a payment in
compensation of loss of future earnings of the debtor" within
the meaning of 11 U.S.C. § 522(d)(11)(E).

Here, Yelverton never asserted in the North Carolina
litigation that he suffered a loss of employment guaranteed to
him *by reason of his being a shareholder*.  Unlike the minority
shareholders in *Garlock*, he never pointed to an agreement
reached incident to the formation of the corporation under which
there was any guarantee of employment by the corporation.
Therefore, the fair value of his shares does not include any
right to employment and the concomitant right to compensation
for loss of such employment.  The mere cessation of a
shareholder's being employed by a corporation, without more, is
not a factor to be taken into account in arriving at a "fair
value" under the North Carolina statute.  Nor did Yelverton even
assert a claim in the North Carolina litigation that he had an
employment contract with Yelverton Farms (independent of any
rights arising as a shareholder) that was breached by the
defendants.  In negotiating the settlement, the trustee had no

17

reason to ascribe loss of employment as a consideration to take into account in fixing the amount of the settlement.  The settlement amount, accordingly, cannot be deemed to be "a payment in compensation of loss of future earnings of the debtor" within the meaning of section 522(d)(11)(E).

### D. Yelverton did not assert a claim for loss of future earnings at the settlement hearing

Moreover, the hearing on the approval of the settlement demonstrates that no portion of the settlement was on account of a claim for compensation for loss of future earnings.  Yelverton never contended at the hearing that the estate had a claim (derived from Yelverton's rights as of the petition date) based on a theory that Yelverton had been entitled to compensation for loss of future earnings.  Having allowed the settlement to be approved without any portion of the settlement having been attributable to a claim for compensation for loss of future earnings, Yelverton cannot now seek to have a portion of the settlement proceeds deemed attributable to such a claim. Instead, the evidence at the settlement hearing demonstrated that, aside from the nuisance value of other claims to which the estate had succeeded that were of little merit, the settlement was attributable to Yelverton's rights as a minority shareholder in Yelverton Farms, and in turn, the value of those rights was based on the potential future earnings of Yelverton Farms.  The

value was not based on any loss of future earnings of Yelverton
for services.

Furthermore, Yelverton's assertion that he had a claim for
a loss of future earnings rests on the theory that he was
entitled to compensation for services he rendered incident to
the Production Contract, but that theory is inconsistent with
the evidence and ruling at the hearing on the settlement.  At
the settlement hearing, Yelverton never contended that he had a
right to compensation for services he provided under the
Production Contract.  Instead, the whole focus of the hearing,
insofar as it concerned the Production Contract, was Yelverton's
contention that without the bankruptcy estate allowing Yelverton
Farms to continue to enjoy rights under the Production Contract,
Yelverton Farms would have no revenue, and thus the settlement
should have been higher.  The court rejected that contention.

Under the settlement agreement, the Production Contract was
*not* assigned to Yelverton Farms.  The bankruptcy estate retained
whatever rights it had in the Production Contract, but they were
worthless.  The trustee testified consistently throughout the
hearing on the settlement that he did not view the Production
Contract as having any value to the estate.  *See, e.g.*,
*Transcript*, Tr. Mtn, Ex. 3 at 77:24-77:25.  The court agreed
with that assessment, as discussed in its oral decision at the
hearing:

19

One of the contentions Mr. Yelverton has made is that
the contract with Maxwell Foods Incorporated, which
entered into the market hog production agreement with
Mr. Yelverton, . . . is a contract with Mr. Yelverton
and that without that contract, the corporation can't
really operate and realize anything.  But as Mr.
Webster testified, **the contract called for the
proceeds to be paid to Yelverton Farm, Ltd.** . . .  And
in the negotiations, the other side has not requested
a transfer of the contract.  They're of the view that
the contract was already assigned and they're
perfectly content to let Mr. Yelverton, over the
estate, retain whatever rights it has under this
contract if indeed it wasn't assigned.  So [the
trustee as part of the settlement has] not had to
assign the contract.  And I think it is a red herring
because if Mr. Yelverton's ownership interest is
purchased by somebody -- by the majority shareholders
pursuant to a liquidation proceeding, they'd be free
to cancel the -- halt the production agreement and
turn around and ask Maxwell Foods, Inc. to enter into
a new agreement with them to get rid of this issue of
the misnomer in the contract that it's one with Mr.
Yelverton instead of one with Yelverton Farms, Ltd. .
. . It's all a red herring.  Everybody agrees these
types of agreements can be cancelled at will and
there's no reason to believe that Maxwell Foods, Inc.
wouldn't turn around and enter into a new contract
with whoever is running Yelverton Farms, Ltd.

*Id.* at 225-27 (emphasis added).  No portion of the settlement

can be deemed attributable to rights that the estate had under

the Production Contract as the trustee and the court both

attributed no value to the estate with respect to the Production

Contract.

Amounts owed to Yelverton Farms under the Production

Contract were paid to Yelverton Farms; and as to the future,

Yelverton Farms was free to enter into a new production contract

that would not be property of the estate.   Therefore, as of the
petition date (when whatever rights Yelverton had under the
Production Contract became property of the estate) and ever
since there was no value to the bankruptcy estate (standing in
Yelverton's shoes) by reason of the Production Contract.

### E. Yelverton's statement that his past distributions were earnings for services rendered is irrelevant

Even if Yelverton had asserted a claim for loss of future
earnings in the North Carolina litigation, and had raised that
claim as a basis for objecting to the settlement, the court
would have rejected that objection.   The claim has no merit
(because Yelverton Farms can terminate the Production Contract
at any time), and the evidence does not show that the settlement
included any portion attributable to compensation for loss of
future earnings.   The record does not support Yelverton's
efforts to morph his right to future stock distributions into
"earnings" by labeling *past* distributions as having been
payments for his services.

It bears repeating precisely what Yelverton says in his
answers to interrogatories.   He says:

> I personally managed the Production Contract from
> September 1994, when the facilities first went into
> production, until May 2008, when Edmundson and Marm
> ordered me to <u>not</u> set foot on the corporate premises
> and <u>not</u> to contact Maxwell Foods, Inc.   This was done
> by on-site inspections and by telephone calls to the
> persons working on the premises.

Debtor's Opp., Ex. 2 at 3-4, ¶ 5.  He also explains that in May

2008, he was "forcibly and involuntarily removed by the majority

Directors, Edmundson and Marm, and ordered by them not to set

foot on the premises, and not to contact Maxwell Foods, Inc."

Id. at 3, ¶ 1.  Therefore, Yelverton was not employed by

Yelverton Farms as of the petition date (May 14, 2009).

In addition, Yelverton states that the Production Contract

with Maxwell Foods called for him to perform the services.

Debtor's Opp., Ex. 2 at 3, ¶ 3.  With respect to how he was paid

for his services to Yelverton Farms prior to May 2008, Yelverton

states: "The compensation that I received for my services was

solely as Sub-Chapter S earnings distributions from the

corporation to me as a stockholder."  Id. ¶ 2.

But Yelverton does not say that he had any agreement with

Yelverton Farms requiring Yelverton Farms to employ him.  See

Debtor's Opp., Ex. 2.  Once Yelverton was ousted by the

directors of Yelverton Farms in 2008, he was no longer employed

by Yelverton Farms and he also had no right to be employed by

Yelverton Farms.  Accordingly, as of the petition date, which

was approximately one year after he was ousted, Yelverton Farms

was not required to employ Yelverton.

All of these undisputed facts show that, without any right

to employment by Yelverton Farms, Yelverton cannot have a claim

for loss of future employment earnings.  Yelverton's

affirmations merely show that *if* he was employed by Yelverton
Farms, *then* his income would be reported as a distribution.  *See*
Debtor's Opp. Ex. 2, at 4 ¶ 8.  But as of the petition date, he
was not employed by Yelverton Farms and had no right to be
employed by Yelverton Farms.  Therefore, Yelverton cannot have
suffered a loss of future employment earnings for which he is
entitled to compensation.

Accordingly, the court rejects Yelverton's argument that
the existence of the Production Contract turns his stock
distributions into earnings within the meaning of 11 U.S.C.
§ 522(d)(11)(E).  As of the petition date, his entitlement to
further stock distributions was based on his stock ownership
interest, not based on a right to perform services to the
corporation.  In other words, Yelverton had a right to be
compensated for the general value of his shares, but he had no
right to be compensated additionally for the loss of a right to
perform services for the corporation.

**F. The settlement proceeds cannot be treated as compensation
for loss of future earnings based on Yelverton's
assertion that his ouster from managing the farm was a
tortious interference with his duties**

Yelverton argues:

Yelverton's  duties  in  personally  managing  the
Production Contract, and being paid "earnings" from
distributions by Yelverton Farms Ltd., commenced in
1994,  and  continued  until  Edmonson/Marm  tortiously
interfered with his duties, and tortiously stopped his
"earnings."

23

Debtor's Opp. at 8, ¶ 37.  From this he argues that the settlement of all claims necessarily included compensation for loss of future earnings.  Several points demolish this argument.

Yelverton never asserted a claim for tortious interference with contract in the North Carolina litigation, and never scheduled such a claim as an asset of the estate.  It is obvious that his assertion of the claim now is an afterthought designed to attempt to transform the settlement proceeds into a form of compensation for something (loss of future salary earnings) that is exemptible under § 522(d)(11)(E).  The parties to the settlement had no reason to decide how much should be paid for such a claim because it was never asserted in the North Carolina litigation.[6]

---

[6]  At the hearing on approval of the settlement, Yelverton and the trustee, Mr. Webster, had the following exchange:

> [Yelverton]: Mr. Webster, based on you being the Chapter 7 trustee and in control of the debtor estate and its affairs, would you be of the opinion that the defendants going to Maxwell Foods and asking for a production contract to replace the one that I have, that that would raise questions of fact as to tortious interference with an existing contractual relationship?

> [Mr. Webster]: I don't think so in this case because the proceeds are already payable to Yelverton Farms.

*Transcript*, Tr. Mtn, Ex. 3 at 81:12-81:20.  That conclusively demonstrates that none of the settlement proceeds were attributable to Yelverton's theory of tortious interference.

To elaborate, Yelverton's claim of tortious interference is entirely without merit. The elements of a tortious interference claim are:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988). The first element does not exist here because the Production Contract conferred no right on Yelverton against Maxwell Farms: the right to payment was conferred on Yelverton Farms, not Yelverton. The third element does not exist because Yelverton Farms never induced Maxwell Farms not to perform under the Production Contract. The fifth element does not exist because Yelverton had no right to be compensated for any performance of services under the Production Contract without an employment agreement with Yelverton Farms, and so there was no actual damage to Yelverton. Moreover, being in control of the Yelverton Farms, the majority shareholders were entitled to tell Yelverton not to set foot on the farm. Yelverton Farms was not obligated to employ Yelverton to perform services under the Production Contract.

Finally, Yelverton Farms was free to take its chances as to whether Maxwell Farms would insist that Yelverton perform the

services called for by the Production Contract.  The evidence at

the hearing to approve the settlement agreement was that

Yelverton Farms would readily be able to enter into a new

Production Contract with Maxwell Farms if that were necessary.

As it developed, that was never necessary.  Maxwell Farms never

complained regarding Yelverton not performing any services under

the Production Contract after May 2008.  In effect, as the

trustee testified at the hearing on approval of the settlement,

the majority shareholders of Yelverton Farms viewed Maxwell

Farms as treating the Production Contract effectively assigned

to Yelverton Farms in its entirety, and did not view it

necessary to have the bankruptcy estate assign the Production

Contract to Yelverton Farms.  As already noted in part D above,

although the estate has continued to own whatever rights

Yelverton had under the Production Contract, those rights were

worthless as of the petition date.

### G. That Yelverton Farms is a subchapter S corporation does not make the stock distributions "earnings"

In addition, for the reasons already enumerated by this

court in its *Memorandum Decision and Order re Objection to

Amended Exemptions*, the fact that Yelverton Farms is a

subchapter S corporation does not result in the liquidation

price of Yelverton's shares being "earnings" within the meaning

of § 522(d)(11)(E).  *See Memorandum Decision* (Dkt. No. 633) at

10-11.  Yelverton argues that when a corporation is a sub-
chapter S corporation, "profits or income distributed to a
stockholder is considered 'earned' income to the stockholder
where he is required to perform some personal services for or on
behalf of the corporation."  Debtor's Mtn. at ¶ 3.  However,
under section 522(d)(11)(E), "earnings" means income generated
by services performed by an individual.  Well before the
petition date, the income flowing to Yelverton as a result of
his shares was not generated by any services he was performing
for the corporation.  Accordingly, the income flowing to him as
a result of his shares did not amount to "earnings" within the
meaning of § 522(d)(11)(E).

**H. Yelverton's Motion for Summary Judgment does not have
merit**

Yelverton moves for summary judgment on the grounds that
his claimed exemptions do not affect the trustee's
administration of the estate and therefore should be allowed.
He argues that the exemptions have no effect on the
administration of the estate because (1) the trustee has already
determined that the property has no value, and (2) there are no
unsecured creditors.  From these two points, Yelverton concludes
that the trustee administered the estate not for the benefit of
creditors, but for the trustee's own personal benefit "just to

27

be paid legal fees." Debtor's Mtn. at ¶ 14. For the reasons
that follow, the court finds no merit to these arguments.

In large part, these arguments are objections to the
propriety of the settlement itself. This contested matter
addresses whether Yelverton is entitled to exempt any portion of
the settlement proceeds from the bankruptcy estate, not whether
the settlement was proper. If the approval of the settlement
were set aside, there would be no settlement proceeds to exempt.
Accordingly, attacks on the propriety of the settlement are
irrelevant.

Moreover, such objections to the propriety of the
settlement constitute an impermissible collateral attack upon
the order approving the settlement, and the order denying
Yelverton's motion for relief from that order under Fed. R. Civ.
P. 60. Yelverton has pursued appeals from both the order
approving the settlement and the order denying Rule 60 relief.[7]
He must challenge those orders through those appeals, and not
via a collateral attack here.[8] In any event, the challenges to
the settlement are without merit.

---

[7] The appeal of the order approving the settlement is Civil
Action No. 12-1539 in the District Court. The appeal of the
order denying Rule 60 relief is Civil Action No. 13-1544 in the
District Court.

[8] To the extent that he is raising objections to the
settlement that were not raised before this court, he is not
entitled to pursue them in the pending appeals.

Yelverton argues that in arriving at the settlement amount the trustee improperly determined that his stock in Yelverton Farms and his litigation claims had no value because the owner (one of Yelverton's sisters and a party to the settlement agreement) of the land on which Yelverton Farms is located refused to renew the lease to Yelverton Farms.  Debtor's Mtn. at ¶¶ 7-8.  In support, Yelverton cites to an e-mail from the trustee, dated May 1, 2011, stating: "Why don't I ask the family to agree that the pig farm lease will not be renewed as part of the settlement and if it is renewed I reserve the right to reevaluate Mr. Yelverton's share of the business."  Debtor's Mtn., Ex. 1.

However, Yelverton has not cited to any evidence in the record supporting his statement that the trustee considered Yelverton's stock and litigation claims to have no value, and the court can find none.  To the contrary, the trustee testified at the hearing on his motion to approve the settlement that the estate's "most viable claim" was the value of Yelverton's ownership interest in Yelverton Farms.  *See Transcript,* Tr. Mtn., Ex. 3 at 41:23.  In addition, the e-mail that Yelverton relies upon merely indicates that the trustee considered the duration of the lease for the land in determining a fair value for Yelverton's shares, and that he determined that a renewal of

the lease would necessitate a reevaluation of the value of
Yelverton's interest.  *See id.* at 11, 34-36.

Yelverton also argues that because he received a discharge
before the settlement negotiations took place, there were no
unsecured creditors at the time of the settlement negotiations
and therefore no unsecured creditors were able to participate in
the settlement negotiations.  Debtor's Mtn. at ¶ 10.  He states:
"The Debtor had received a Discharge on December 3, 2010, and
thus after that date, there would be no unsecured Creditors."
*Id.*  Yelverton is incorrect that his receipt of a discharge
somehow eradicates unsecured creditors.  A discharge releases a
debtor from personal liability on his debts and imposes an
injunction against acts to collect the debt as a personal
liability of the debtor; a discharge does not extinguish a debt,
and it certainly does not extinguish the existence of unsecured
creditors who continue to hold claims against the estate.  *See*
11 U.S.C. § 524(a); *see also Houston v. Edgeworth (In re
Edgeworth)*, 993 F.2d 51, 53 (5th Cir. 1993) ("A discharge in
bankruptcy does not extinguish the debt itself, but merely
releases the debtor from personal liability for the debt.").

Yelverton seems to be arguing that the settlement was only
for the benefit of the trustee because after the discharge was
entered, no unsecured creditors could benefit from the
settlement.  Yelverton misunderstands the bankruptcy process.

The entry of a discharge has no effect on the trustee's
distribution of proceeds from the liquidation of nonexempt
estate assets.  The discharge does not wipe out the unsecured
creditors' rights to distributions from estate assets.  If there
are sufficient settlement proceeds available to permit a
distribution toward payment of creditors' unsecured claims, the
trustee must distribute them.

     Yelverton may be arguing that the settlement resulted in
proceeds that will be exhausted by the trustee's and the
trustee's attorneys' administrative claims, with the result that
the settlement has not benefitted creditors holding unsecured
claims, and that those creditors will not be harmed by allowing
Yelverton to exempt the proceeds.  Even if administrative claims
will exhaust the settlement proceeds, that is not a reason to
permit Yelverton to exempt the proceeds under section
522(d)(11)(E).  After payment of allowed secured claims,
administrative claimants are generally the entities with the
first entitlement to payment from the estate.  *See* 11 U.S.C.
§§ 507(a)(1)(C), 507(b), and 726(a)(1).  That right to a
priority of payment from the estate cannot be diminished by
permitting a debtor to exempt the proceeds of a settlement
pursuant to an exemption provision that has no applicability.

     In particular, Yelverton objected to the settlement because
he hoped that there would be a greater recovery from the North

31

Carolina litigation, if it were pursued, that would result in a
significant distribution from the estate to his former spouse to
whom he owes a significant nondischargeable debt that she has
asserted as a claim in the bankruptcy case.[9]  That Yelverton is
not being allowed to have the estate take its chances in
litigation in the hope that it would produce a larger sum is not
a reason to permit Yelverton to exempt the settlement proceeds
from the estate pursuant to an exemption provision of no
applicability.

Furthermore, to the extent Yelverton is arguing that the
unsecured creditors were not given an opportunity to participate
in the settlement, this argument fails.  *See* Debtor's Mtn. at
¶ 10.  To clarify, it was the trustee, not the unsecured
creditors, who had the authority to negotiate a settlement of
the litigation claims in the North Carolina litigation,

---

[9] A trustee administers the bankruptcy estate for the
benefit of all stakeholders, including all entities asserting a
claim against the estate and the debtor as the entity having a
residual interest in the estate if all claims are paid.  A
trustee's "duty is to maximize the value of the estate, not of a
particular group of claimants." *In re Cent. Ice Cream Co.*, 836
F.2d 1068, 1072 (7th Cir. 1987).  In approving the settlement, I
did not focus on the interests of any particular group of
stakeholders, and approved it instead as in the best interest of
the estate.  The approved settlement will not result in as
significant a distribution to Yelverton's former spouse as
Yelverton had *hoped* would occur if the settlement had been
disapproved and the estate had taken its chances in litigation.
The trustee and the court took the estate's chances in
litigation into account in evaluating the settlement, and
concluded that the estate would fare better under the
settlement.

including a transfer of Yelverton's stock incident thereto, because these are property of the estate.  In turn, it was the trustee who had the authority to seek court approval of that settlement.  The trustee gave all creditors notice of the opportunity to object to the proposed settlement agreement.  *See Notice of Opportunity to Object* (Dkt. No. 452).  Two of them objected to the settlement and participated at the hearing on the motion to approve the settlement.  Creditors were accorded all of the rights to participate in the settlement process that are accorded to them by the Bankruptcy Code and applicable rules.

**IV.   Conclusion**

For these reasons, the court grants the trustee's motion for summary judgment on his objection to Yelverton's claim of exemption under 11 U.S.C. § 522(d)(11)(E) and denies Yelverton's motion for summary judgment.  The claimed exemption will be disallowed.  A separate order follows.

[Signed and dated above.]

Copies to: Debtor; Recipients of e-notification of orders.

33