The document below is hereby signed.

Signed: August 29, 2016

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                              )
                                   )
STEPHEN THOMAS YELVERTON,          )     Case No. 09-00414
                                   )     (Chapter 7)
                Debtor.            )

AMENDED MEMORANDUM DECISION RE
TRUSTEE'S SPECIAL COUNSEL'S APPLICATION FOR COMPENSATION

This addresses the application (titled *Petition for Payment of Compensation to Special Legal Counsel*) (Dkt. No. 948) filed by Ronald L. Gibson of Ruff, Bond, Cobb, Wade & Bethune, LLP, seeking allowance under § 330(a)(1) of the Bankruptcy Code (11 U.S.C.) and Fed. R. Bankr. P. 2016 of a claim for compensation for acting as special counsel for the chapter 7 trustee, Wendell W. Webster. For reasons discussed below, the debtor, Stephen Thomas Yelverton, lacks standing to object to the application because he has no financial stake in the outcome of the application. His objection to the application, the only objection filed regarding the application, will be dismissed on that basis. As explained later, Webster and his own law firm are the only parties that would be adversely affected by an allowance

of Gibson's application.  They have consented to Gibson's fee

application.  Upon the court's ruling on Gibson's application,

Webster is ready to bring his administration of the case to a

close.  The court has examined the fee application, and finds the

fees to be reasonable.  Accordingly, the court will allow the

application.

I

BACKGROUND

This case began as a case under chapter 11 of the Bankruptcy

Code, with Yelverton serving as a debtor in possession, but the

case was converted to a chapter 7 case.  Webster was first

appointed as an interim trustee under 11 U.S.C. § 701 and became

the trustee under 11 U.S.C. § 702(d) when no one else was elected

trustee.  Webster obtained approval of a settlement with

Yelverton's siblings that resulted in the bankruptcy estate

receiving $110,000.  As Webster testified at the hearing on his

application for compensation, these are the sole funds Webster

has on hand to distribute.

Yelverton's former spouse, Alexandra N. Senyi de Nagy-Unyom,

has a nondischargeable claim for a domestic support obligation of

2

$612,600.[1]  When the settlement was approved, it looked like

Senyi, by reason of 11 U.S.C. § 507(a)(1)(A), would receive a

substantial portion of the $110,000 after payment of any

exemption Yelverton might be entitled to assert against the

$110,000, and after payment of Webster's administrative expenses

entitled to priority under 11 U.S.C. § 507(a)(1)(C).  The court

has ordered Webster to pay Yelverton's allowed exemption claim

against the $110,000 fund, which will leave only $98,800 in the

estate.  Sadly, Yelverton's subsequent excessive litigiousness

(including his repeated unsuccessful and, for the most part,

frivolous efforts to attempt to undo the approved settlement) has

caused Webster to incur administrative expenses far greater than

was anticipated when the settlement was approved.  The court has

allowed administrative expense claims of Webster and his law firm

under 11 U.S.C. § 503(b)(2) in the amount of $138,593.38, an

amount that exceeds the $98,800 in funds remaining in the estate

after payment of Yelverton's exemption claim.  Specifically, the

---

[1]  Senyi's proof of claim is Claim No. 31 on the court's
claims register.  Yelverton filed an objection (Dkt. No. 111) to an
earlier version of that claim (Claim No. 25 on the claims
register), but the court dismissed the objection without prejudice
to renewal if anything was left to pay Senyi's claim after payment
of administrative expense claims entitled to priority over Senyi's
claim.  Dkt. No. 874.  Moreover, Yelverton now concedes that, based
on orders of the Superior Court of the District of Columbia, he now
has no basis for objecting to the portion of Senyi's proof of claim
that asserts her claim for domestic support obligations.  *See*
Yelverton's *Response to Order to Show Cause re: Claims of Alexandra
N. Senyi de Nagy-Unyom Against the Debtor Estate* (Dkt. No. 864, at
¶ 2).

3

court has allowed two administrative expense claims in the

chapter 7 case:

- Webster's claim for $8,190.00 in compensation; and

- a claim by Webster, Fredrickson, Correia & Puth, PLLC,

  Webster's law firm that represented Webster, for

  $120,323.50 in compensation and $10,079,88 in

  reimbursement of actual, necessary expenses, comprising

  a total of $130,403.38.

As explained later, under 11 U.S.C. § 507(a)(1)(C), the two

allowed claims for § 503(b)(2) administrative expenses, totaling

$138,593.38, are entitled to priority over all other claims

against the $98,800 in non-exempt estate funds.  However,

Gibson's claim, if allowed, will share the same level of

priority.  Even if Gibson's application is denied, the two

allowed claims for § 503(b)(2) administrative expenses will

exhaust the estate, leaving nothing to distribute to Senyi or to

holders of other claims in this case.

II

YELVERTON'S LACK OF STANDING
TO OBJECT TO GIBSON'S APPLICATION

Yelverton objected to Gibson's fee application, but the

court's previous allowance of $138,593.38 in § 503(b)(2)

administrative expenses eliminated Yelverton's financial stake in

any claim by Gibson for compensation, thereby depriving Yelverton

of standing to object to Gibson's application.  The two reasons

4

why Yelverton previously had standing to object to Gibson's
application no longer apply.

A.

YELVERTON'S CLAIM FOR REIMBURSEMENT OF EXPENSES

Yelverton has sought reimbursement of expenses he incurred
as a debtor in possession when this case was pending as a chapter
11 case.  He had standing to object to any claim only if the
claim's allowance would reduce the amount he would receive on his
claim.  When, even if an attorney's application for compensation
is denied, a party  holding a claim against the estate will not
receive a distribution from the estate, that party lacks the
necessary financial stake as a claimant to have standing to
object to the attorney's application.  *See In re Runnels
Broadcasting Sys., LLC*, No. 7-02-14217 JR, 2009 WL 4611447, at *3
(Bankr. D.N.M. Dec. 1, 2009) (finding that a law firm lacked
standing to object to a chapter 7 trustee's application for
compensation when the law firm would not receive a distribution
on its chapter 11 administrative expense claim even if the court
denied the trustee's compensation application).

Here, under 11 U.S.C. § 726(b), Yelverton's chapter 11
expense claim is not payable until after allowed administrative
expense claims incurred in the chapter 7 case have been paid.
After the distribution of the $98,800 of non-exempt estate funds
in partial payment of allowed § 503(b)(2) administrative expenses

5

incurred by Webster and his law firm in the chapter 7 case (which already stand at $138,593.38), nothing will be left to pay Yelverton's claim for reimbursement of expenses incurred in the chapter 11 case regardless of whether Gibson's application is denied.  Accordingly, Yelverton's claim for reimbursement related to his original chapter 11 case does not provide Yelverton with standing to object to Gibson's application in the final chapter 7 case, unless and until the aforementioned allowance of the $138,593.38 of § 503(b)(2) administrative expenses is set aside by way of appeal, or otherwise, in an amount sufficient to free up estate funds for potential payment on Yelverton's chapter 11 administrative expense claim.[2]

B.

THE EXISTENCE OF A CLAIM FOR A NONDISCHARGEABLE
DOMESTIC SUPPORT OBLIGATION DOES NOT CONFER STANDING

As already noted, Senyi has a nondischargeable claim for a domestic support obligation of $612,600.  Yelverton would have standing to object to Gibson's application if defeating that application would result in Senyi receiving a payment on her claim.  *See McGuirl v. White*, 86 F.3d 1232, 1235-36 (D.C. Cir.

---

[2]   In addition, even if there were no chapter 7 administrative expense claims, Senyi's domestic support obligation claim would enjoy priority under 11 U.S.C. § 507(a)(1)(A) over Yelverton's administrative expense claim and would likewise deplete the remaining non-exempt funds in the estate.

1996).[3]  The court treated Yelverton as having standing to object

to the allowance of the aforementioned $138,593.38 in § 503(b)(2)

administrative expenses (which have since been approved by the

court over his objection) because of Senyi's nondischargeable

claim.  However, as explained below, under 11 U.S.C.

§ 507(a)(1)(C) the already allowed § 503(b)(2) administrative

expenses of $138,593.38 are entitled to priority over Senyi's

claim, and exceed the estate's non-exempt funds of  $98,800.

After payment to Yelverton of his exempted portion of the

$110,000, and devotion of the $98,800 remainder towards payment

of allowed § 503(b)(2) administrative expenses, Senyi will not

receive a payment on her claim regardless of the outcome of

Gibson's application.  Accordingly, the existence of Senyi's

---

[3]  *But see In re Adams*, 424 B.R. 434, 437 (Bankr. N.D. Ill.
2010) (noting that the effect of such nondischargeable claims upon
a debtor is generally indirect and granting standing to every
debtor who happens to be subject to some nondischargeable claim
would interfere with the public policy of the prompt administration
of chapter 7 cases).  It is noteworthy that Senyi, the holder of
the nondischargeable claim in this case, the one with a direct
stake in whether that claim receives a distribution from the
estate, did not object to Gibson's application or to the
applications for chapter 7 § 503(b)(2) administrative expenses that
have already been allowed in the amount of $138,593.38.  In
addition, Yelverton's repeated requests for in forma pauperis
treatment in this case suggest that Yelverton will never be able to
satisfy Senyi's nondischargeable claim even if no administrative
expenses were allowed in the case.  I suspect that Yelverton's true
motivation in objecting to Gibson's application is so that, like a
dog in a manger, he can once again challenge the wisdom of
Webster's settlement with Yelverton's siblings (this time by
examining Gibson's negotiation of that settlement) even though that
settlement is a done deal.

claim does not confer standing on Yelverton to object to Gibson's application unless and until the allowance of $138,593.38 in § 503(b)(2) administrative expenses is set aside in an amount sufficient to free up estate assets for potential distribution on Senyi's claim.

If there were no administrative expense claims in the case, Senyi's claim would be entitled to priority over all other claims in the case by reason of 11 U.S.C. § 507(a)(1)(A). However, 11 U.S.C. § 507(a)(1)(C) provides an exception to this priority by providing that:

> If a trustee is appointed or elected under section 701, 702, 703, 1104, 1202, or 1302, the administrative expenses of the trustee allowed under paragraphs (1)(A), (2), and (6) of section 503(b) shall be paid before payment of claims under subparagraphs (A) and (B), to the extent that the trustee administers assets that are otherwise available for the payment of such claims.

For the reasons that follow, § 507(a)(1)(C) accords the aforementioned $138,593.38 in allowed § 503(b)(2) administrative expenses priority over Senyi's domestic support obligation claim.

Section 507(a)(1)(C) limits the administrative expenses to which it may accord priority to three types of administrative expenses, namely, "the administrative expenses of the trustee allowed under paragraphs (1)(A), (2) and (6) of section 503(b)," to the exclusion of all administrative expenses allowed under 11 U.S.C. § 503(b). For example, administrative expenses allowed under § 503(b)(1)(B) for certain taxes are *not* eligible for such

8

possible priority under § 507(a)(1)(C).  Instead, such tax

administrative expenses are accorded a lower level of priority

under 11 U.S.C. § 507(a)(2) and would only be paid after

§ 507(a)(1)(A) and (B) domestic support obligation claims.[4]

However, the three types of administrative expenses that are

eligible for priority under § 507(a)(1)(C) are accorded such

priority only "to the extent that the trustee administers assets

that are otherwise available for the payment of such

[§ 507(a)(1)(A) or (B) domestic support obligation] claims."

When there are no domestic support obligations in a case,

all administrative expense claims incurred during the pendency of

the case in chapter 7 share (with certain other claims) a first

level of priority under § 507(a)(2).  However, when there are

domestic support obligations of the character described in

§ 507(a)(1)(A) or (B), the priority scheme is altered:

- § 507(a)(1)(C) accords first priority to the
  administrative expenses of the trustee allowed under
  § 503(b)(1)(A), (2), and (6) "to the extent that the
  trustee administers assets that are otherwise available
  for the payment of [allowed unsecured claims for
  domestic support obligations specified in

---

[4]  Section 507(a)(2) accords second priority, after claims
described in § 507(a)(1)(A)-(C), to:

administrative expenses allowed under section 503(b) of
this title, unsecured claims of any Federal reserve bank
related to loans made through programs or facilities
authorized under section 13(3) of the Federal Reserve Act
(12 U.S.C. 343), and any fees and charges assessed
against the estate under chapter 123 of title 28.

§ 507(a)(1)(A) and (B)]."

- § 507(a)(1)(A) accords second priority to the types of allowed unsecured claims for domestic support obligations described therein.

- § 507(a)(1)(B) accords third priority to the types of allowed unsecured claims for certain domestic support obligations that have been assigned to or are owed directly to or recoverable by a governmental unit.

- § 507(a)(2) accords fourth priority to allowed administrative expense claims other than those accorded first priority under § 507(a)(1)(C), and to certain other claims.

In other words, when there are allowed unsecured claims for domestic support obligations described in either § 507(a)(1)(A) or § 507(a)(1)(B), the administrative expenses of the trustee allowed under § 503(b)(1)(A), (2), and (6) are elevated to a higher priority than other allowed administrative expense claims only "to the extent that the trustee administers assets that are otherwise available for the payment of [allowed unsecured claims for domestic support obligations specified in § 507(a)(1)(A) and (B)]."

This limiting language ("to the extent that the trustee administers assets that are otherwise available for the payment of [allowed unsecured claims for domestic support obligations specified in § 507(a)(1)(A) and (B)]") has been accurately described as "vague terminology appearing nowhere elsewhere in the Code" and as "obscure terminology[.]"  Lynne F. Riley, *BAPCPA at Ten: Enhanced Domestic Creditor Protections and Enforcement*

10

*Rights*, 90 Am. Bankr. L. J. 267, 278 (2016). However, its meaning is readily discernible.

The limiting language of § 507(a)(1)(C) does not provide that the specified expenses enjoy priority only "to the extent that the trustee administers assets that are otherwise available for the payment of such [§ 507(a)(1)(A) and (B) domestic support obligation] claims" **and that the trustee incurs such expenses in administering such assets.** Instead, for § 507(a)(1)(C) priority to be accorded to a trustee's § 503(b)(1)(A), (2) or (6) administrative expenses the trustee must simply administer assets that are otherwise available for the payment of § 507(a)(1)(A) or (B) domestic support obligation claims. To enjoy first priority under § 507(a)(1)(C) the trustee need not have incurred the claimed § 503(b)(1)(A), (2) or (6) administrative expenses specifically in administering "assets that are otherwise available for the payment of such claims [under § 507(a)(1)(A) or (B)]." For reasons discussed below, such a requirement would be

11

at odds with the evident purposes of the statute.[5]

The purposes served by the language "to the extent that the trustee administers assets that are otherwise available for the payment of such claims [under § 507(a)(1)(a) or (b)]" in § 507(a)(1)(C) are two-fold.  First, this limiting language contemplates the possibility that the expenses awarded priority under § 507(a)(1)(C) may exhaust the estate's assets, thereby leaving nothing to be paid on the § 507(a)(1)(A) and (B) claims. The assets a trustee administers are "otherwise available" to pay the § 507(a)(1)(A) and (B) claims, but not if the administrative expenses accorded priority under § 507(a)(1)(C) exhaust the assets of the estate.  It is not necessary that the § 507(a)(1)(A) and (B) claims receive a distribution in order for priority to be accorded the administrative expenses specified in § 507(a)(1)(C).  *See In re Barker*, No. 11-04346-TOM-7, 2015 WL

---

[5] 4 *Collier on Bankruptcy* ¶ 507.03[2] (16th ed. 2016) states:

> If an administrative expense falls into one of these three categories [*i.e.*, § 503(b)(1)(A), (2), and (6)], and if it was incurred by the trustee in administering assets used toward the payment of such [domestic support obligation] claims, the trustee will be entitled to be reimbursed ahead of the holders of priority claims under sections 507(a)(1)(A) and (B).

This view is accurate so far as it goes, but to the extent that it suggests that the trustee's administrative expenses *must* have been incurred in administering assets that are available to pay the § 507(a)(1)(A) and (B) domestic support obligations, it goes too far and would result in unwarranted outcomes and impose unwarranted burdens on the courts that Congress did not likely intend.

2208356, at *5 (Bankr. N.D. Ala. May 8, 2015).

Second, the limiting language assures that the priority under § 507(a)(1)(C) does not exceed the amount of the § 507(a)(1)(A) and (B) claims.  Administrative expense claims generally enjoy second priority under 11 U.S.C. § 507(a)(2) after any § 507(a)(1)(A) or (B) domestic support obligation claims, but the administrative expense claims specified in § 507(a)(1)(C) have a higher priority than both § 507(a)(1)(A) and (B) domestic support obligation claims and other administrative expense claims enjoying only a § 507(a)(2) priority.  Without § 507(a)(1)(C)'s limiting language ("to the extent that the trustee administers assets that are otherwise available for the payment of such claims [under § 507(a)(1)(A) or (B)]"), § 507(a)(1)(C) would provide:

> If a trustee is appointed or elected under section 701, 702, 703, 1104, 1202, or 1302, the administrative expenses of the trustee allowed under paragraphs (1)(A), (2), and (6) of section 503(b) shall be paid before payment of claims under subparagraphs (A) and (B).

If § 507(a)(1)(C) were written that way, the types of administrative expense claims eligible for priority under § 507(a)(1)(C) would enjoy a priority over all other administrative expense claims even if there were no § 507(a)(1)(A) or (B) domestic support obligation claims in the case, or even if existing domestic support obligation claims were far less than the funds the trustee had on hand to distribute.

13

The limiting language in the actual § 507(a)(1)(C) provision thus explains that assets are "otherwise available" to pay § 507(a)(1)(A) and (B) claims only to the extent of the amount of the funds that would be needed to pay those § 507(a)(1)(A) and (B) claims.

To elaborate, consider first a case in which there are *no* claims under § 507(a)(1)(A) or (B).  In that instance, § 507(a)(1)(C) has no applicability.  The provision only applies "to the extent that the trustee administers assets that are otherwise available for the payment of such claims [under § 507(a)(1)(A) or (B)]."  Without that limiting language, the trustee's administrative expenses "allowed under paragraphs (1)(A), (2), and (6) of section 503(b)" would be accorded priority over all other administrative expenses of the trustee, including, for example, taxes allowed under § 503(b)(1)(B). Instead, because of the limiting language, the result is that when there are no claims under § 507(a)(1)(A) or (B), all administrative expenses share the same level of priority under § 507(a)(2).

Consider second a case in which there *are* claims accorded priority under § 507(a)(1)(A) or (B).  In such a case, the limiting language ("to the extent that the trustee administers assets that are otherwise available for the payment of such claims [under § 507(a)(1)(A) or (B)]") controls the extent to

which the trustee's administrative expenses under § 503(b)(1)(A),
(2) and (6) are entitled to first priority under § 507(a)(1)(C)
instead of sharing with other administrative expense claims only
a § 507(a)(2) level of priority.  For example, if there *are*
claims under § 507(a)(1)(A) or (B) but they do not exceed the
funds the trustee is to distribute, the trustee will have
administered funds equal to the § 507(a)(1)(A) and (B) claims
plus additional funds that are *not* "otherwise available for the
payment of such claims [under § 507(a)(1)(A) or (B)]."  A trustee
is not entitled to a § 507(a)(1)(C) priority in an amount that
exceeds the § 507(a)(1)(A) and (B) claims.

Consider a case in which the estate consists of a single 11
U.S.C. § 550(a) recovery of $300,000, and in which the only
allowed claims are:

- a $100,000 § 507(a)(1)(A) claim;

- a $200,000 administrative expense claim of the
  trustee allowed under § 503(b)(2); and

- a $50,000 tax claim incurred by the estate and
  allowed under § 503(b)(1)(B).

The trustee would be entitled to assert that $100,000 of the
§ 503(b)(2) expenses, but no more, are entitled to a
§ 507(a)(1)(C) priority.  After payment of $100,000 of the
§ 503(b)(2) claim, and payment of the $100,000 § 507(a)(1)(A)
claim, the distribution of the remaining $100,000 of estate funds

15

would be governed by § 507(a)(2), with the $100,000 remainder of the trustee's § 503(b)(2) claim sharing pro rata with the $50,000 tax claim enjoying the same § 507(a)(2) level of priority.

Limiting § 507(a)(1)(C) priority to expenses the trustee specifically incurred in administering assets that are otherwise available for payment of § 507(a)(1)(A) and (B) claims would lead to unwarranted outcomes and would place unwarranted burdens on the court in administering § 507(a)(1)(C) is readily evident.  As an example of an unwarranted outcome, consider a case in which the trustee incurred $50,000 in allowed administrative expenses in a promising but ultimately unsuccessful effort to recover under 11 U.S.C. § 550(a) a transfer that was allegedly avoidable under 11 U.S.C. § 547(b).  That $50,000 in allowed administrative expenses would not have been incurred by the trustee in administering assets used toward the payment of the § 507(a)(1)(A) and (B) domestic support obligations claims, even though the trustee undertook the efforts for the benefit of the holders of § 507(a)(1)(A) and (B) claims.

Furthermore, not all administrative expenses of a trustee are incurred in administering assets.  For example, part of a trustee's duties under 11 U.S.C. § 704(a) include:

- investigating the debtor's financial affairs;

- ensuring that the debtor shall perform his intention as specified in 11 U.S.C. § 521(a)(2)(B);

- objecting to the debtor's discharge, if advisable; and

16

- providing the notice specified by 11 U.S.C. § 704(c) to the holder of a domestic support obligation.

It is unlikely that Congress intended to place on the courts the unwarranted burden of ascertaining which expenses were incurred in performing those types of duties versus which expenses were incurred by the trustee in administering assets used toward the payment of § 507(a)(1)(A) and (B) domestic support obligation claims, a requirement not expressly written in § 507(a)(1)(C).

To recapitulate, all that is required for a trustee's allowed § 503(b)(2) administrative expenses to enjoy first priority under § 507(a)(1)(C) is that "the trustee administers assets that are otherwise available for the payment of such [§ 507(a)(1)(A) and(B)] claims," and the trustee is not required to show that he incurred the claimed administrative expenses in

administering such assets.[6]

Here, the trustee's administrative expense claims of

$138,593.38 were allowed as administrative expenses under

§ 503(b)(2), classified as "compensation and reimbursement

awarded under section 330(a) of this title."  Accordingly, the

$138,593.38 in administrative expenses in this case are the type

of expenses that may enjoy priority under § 507(a)(1)(C) as

"administrative expenses of the trustee allowed under paragraph[ ]

_____

[6] There remains an issue, having no relevance to this
case,of whether "assets that are otherwise available for the
payment of such claims" include the exempt proceeds of an item of
property in which the debtor had an exempt interest.  *See* 11
U.S.C. § 522(b).  Under 11 U.S.C. § 522(c)(1), the exempt
proceeds remain subject to enforcement under nonbankruptcy law of
a domestic support obligation.  Nevertheless, § 507(a)(1)(C) does
not provide a basis for disallowance of the exemption, and,
accordingly, does not authorize a trustee to administer such
exempt proceeds as property of the estate for the benefit of
holders of § 507(a)(1)(A) or (B) claims.  *See In re Quezada*, 368
B.R. 44, 47-49 (Bankr. S.D. Fla. 2007); *In re Vandeventer*, 368
B.R. 50, 52-54 (Bankr. C.D. Ill. 2007).  Theoretically, a trustee
might end up distributing exempt proceeds to a holder of a
§ 507(a)(1)(A) or (B) claim (for example, pursuant to a writ of
execution served by that holder on the trustee).  *See* Lynne F.
Riley, *BAPCPA at Ten: Enhanced Domestic Creditor Protections and
Enforcement Rights*, 90 Am. Bankr. L.J. 267, 278-81 (2016).
Whether such exempt funds are funds "the trustee administers"
would depend upon whether the term "administers" in
§ 507(a)(1)(C) is accorded a broad sense or instead the narrow
sense generally used in the Bankruptcy Code of meaning the
administration of the estate.  *See* 11 U.S.C. § 704(a)(1)
(establishing the trustee's duty to "collect and reduce to money
the property of the estate"); 11 U.S.C. § 726(a) (describing the
trustee's duty, with exceptions of no relevance to this analysis,
to distribute "property of the estate" according to the
priorities set forth in § 507); 11 U.S.C. § 350(a) (requiring the
court to close a case "[a]fter the estate is fully
administered").

. . . (2) . . . of section 503(b)." Section 507(a)(1)(C) accords priority to the $138,593.38 "to the extent that the trustee administers assets that are otherwise available for the payment of" Senyi's domestic support obligation claim. The trustee holds $98,800 in non-exempt funds, and that $98,800 is "otherwise available" for the payment of Senyi's claim, which exceeds $600,000. Accordingly, the $138,593.38 of allowed administrative expense claims are entitled to priority over Senyi's claim under § 507(a)(1)(C)and the entirety of the non-exempt funds will be used in payment of those administrative expense claims (plus any amount allowed as an administrative expense claim of Gibson).

Even if § 507(a)(1)(C) priority for a trustee's administrative expenses extended to only those expenses incurred in administering assets available to pay the § 507(a)(1)(A) and (B) domestic support obligation claims, the only meaningful asset Webster has administered is the $110,000 settlement fund (and the causes of action and rights that were the subject of that settlement), of which only $98,800 are non-exempt funds that would be "otherwise available" to pay Senyi's claim. The allowed § 503(b)(2) administrative expenses, so far, total $138,593.38. Webster's allowed commission of $8,190.00 is based on the $98,800 non-exempt estate funds, and necessarily is an expense incurred in administering that $98,800. That leaves $90,610 of estate funds at issue. A review of the application that led to

19

Webster's law firm's allowed § 503(b)(2) administrative expenses
of $130,403.38 readily reveals that at least $90,610 (that is, at
least roughly 69.5%) of those expenses were incurred in
administering that asset – namely, by way of engaging in
litigation related to the $110,000 settlement and the claims and
rights it settled.  The litigation that entailed the
administration of that asset (the settlement fund) included:

- the hearing on the approval of the settlement;

- defending against the appeal of the order approving the
  settlement;

- defending against motions to set aside that order;

- attempting to intervene in the Superior Court divorce
  proceeding to address any property distribution in that
  case that would recast the ownership of the rights that
  were the subject of the settlement as belonging to
  Senyi instead of to Yelverton (*see In re Yelverton*, 477
  B.R. 282, 293 & n.6 (Bankr. D.C. 2012) (Dkt. No. 506 in
  this case, at 20 & n.6));

- defending against Yelverton's efforts to require the
  trustee to abandon the claims and rights that led to
  the settlement;

- objecting to Yelverton's improper exemption claims
  against the estate;

- defending against Yelverton's request to remove Webster
  as trustee based on alleged improprieties relating to
  the $110,000 settlement;

- defending against Yelverton's adversary proceeding
  against Webster and Webster's surety (the company that
  issued Webster a trustee's bond) (*see In re WHET, Inc.*,
  62 B.R. 770, 774-75 (Bankr. D. Mass. 1986) (allowing a
  trustee's attorney's fees incurred in defending against
  unmeritorious claims for breach of the trustee's
  fiduciary duties in administering assets));

- defending against another adversary proceeding involving Webster's surety; and

- filing a motion to set a bar date for administrative claims against the estate.

It is hard to identify time entries that could be considered as *not* incurred in the administration of the $98,800 non-exempt estate.

The allowed § 503(b)(2) administrative expenses of $138,593.38 and Gibson's claim are the only claims asserted in this case that are of the type for which § 507(a)(1)(C) priority might apply (a priority limited to § 503(b)(1)(A), (2), and (6) claims). Because they hold allowed § 507(a)(1)(C) claims entitled to priority over Senyi's claim and over claims accorded only § 507(a)(2) priority or lower priority, Webster and his law firm are the only parties with standing to object to Gibson's application, and they have no objection to Gibson's application. Although there may or may not be an administrative tax claim under § 503(b)(1)(B) in this case, the holder of such a tax claim would enjoy priority only under § 507(a)(2) and would be junior to the allowed administrative expense claims of $138,593.38.

III

For the foregoing reasons, Yelverton lacks standing at this juncture to object to Gibson's application. At this juncture, Yelverton has no financial stake in the outcome of Gibson's application because the denial of Gibson's application would not have any impact on Yelverton. Accordingly, an order has been

21

entered that allows Gibson's application.   If circumstances

change such that a disallowance of Gibson's claim could result in

funds being distributed to Senyi, Yelverton can pursue a motion

under Fed. R. Civ. P. 60(b)(5) to vacate the order and to have

the court hear Yelverton's objection to Gibson's claim.

                                                  [Signed and dated above.]

Copies to: Debtor; recipients of e-notification of filings.